Argued and submitted February 8, 2005, petition for judicial review dismissed as to default final orders dated October 11 and 16, 2002; affirmed as to final orders dated November 26, 2002, and January 29, 2003, April 26, 2006

## ETU, INC.,
### an Oregon corporation,
### and Ed Niemi Oil Company, Inc.,
### an Oregon corporation,
*Petitioners,*

*v.*

## ENVIRONMENTAL QUALITY COMMISSION,
*Respondent.*

## LQ/T-NWR-02-096; A121106

134 P3d 1019

Allan B. Bakalian argued the cause for petitioners. With him on the briefs was Marten Law Group PLLC.

Jas. Jeffrey Adams, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Linder, Presiding Judge, and Haselton* and Ortega, Judges.

ORTEGA, J.

---

* Haselton, J., *vice* Ceniceros, S. J.

## ORTEGA, J.

Respondents ETU, Inc. (ETU), and Ed Niemi Oil Company, Inc. (Niemi),[1] seek judicial review of final orders issued by the Department of Environmental Quality (DEQ).[2] Respondents contend that DEQ erred by serving them, but not their attorney, with a notice of violation and subsequent default final orders and then by denying respondents' late request for hearing. Because we conclude that respondents did not timely seek judicial review of the default final orders and that we therefore lack jurisdiction, we dismiss the petition for judicial review as to those orders. As to DEQ's order denying respondents' late request for hearing, we conclude that DEQ did not act outside the range of its discretion, ORS 183.482(8)(b)(A), and affirm that order.

Except where noted, the pertinent facts are not in dispute. Niemi owns a gas station, and ETU owns the gas station's underground storage tanks. In February 1999, while Niemi and ETU were upgrading the underground storage tanks, petroleum product was discovered in the soil and groundwater in the area surrounding the tanks; such uncontained petroleum is referred to as "free product." In March 1999, DEQ issued respondents a notice of noncompliance, requesting that they, among other actions, engage in removal of the free product. In the ensuing three years, respondents failed to conduct free product removal to DEQ's satisfaction.

In early 2002, respondents retained their current attorney, Bakalian. In April of that year, Bakalian notified DEQ that he would be representing respondents with regard to the contamination of the area around the gas station. That

---

[1] ETU and Niemi were respondents below, and we refer to them as such in this opinion, although they are petitioners on appeal.

[2] The contested case at issue was before the Environmental Quality Commission (EQC). DEQ is a department under EQC and is charged with commencing enforcement actions. ORS 468.030; ORS 468.090(2). Pursuant to a rule in effect during the relevant period, DEQ's director or the director's authorized delegates were also authorized to prepare and execute default final orders on behalf of EQC when a hearing was not timely requested. *Former* OAR 340-011-0136(3)(a), *amended and renumbered* OAR 340-011-0505, certified effective Dec 12, 2003. Although the final orders were issued by DEQ on behalf of EQC, the parties in their briefs simply refer to DEQ. For ease of reference, we adopt the same approach.

same month, DEQ issued respondents a second notice of non-compliance for failing to conduct free product removal; DEQ served Bakalian with a copy of the notice. Following that notice, respondents conducted free product removal on a regular basis.

In August 2002, Bakalian met with DEQ representatives to discuss the status of the second notice of noncompliance issued against respondents. At that meeting, the DEQ representatives indicated that DEQ was in the process of issuing penalties against respondents for several alleged past violations. Bakalian gave one of them his business card and requested that he be notified of any actions taken against respondents.

On September 19, 2002, DEQ issued respondents, jointly and severally, a notice of violation assessing a civil penalty in the amount of $126,522.[3] The notice of violation indicated that it would become final "by operation of law without any further action or proceeding" unless DEQ received a request for a hearing on the matter, accompanied by a written answer to allegations made in the notice, within 20 days. Despite Bakalian's earlier request, DEQ did not serve the notice on Bakalian. Instead, DEQ served respondents' registered agent, Bechtolt (who was also Niemi's president), by certified mail with return receipt.

Although Bechtolt wrote a letter dated October 1 requesting that DEQ hold a hearing and send all information pertaining to the matter to Bakalian, DEQ found that it never received that letter. Because DEQ did not receive a response from respondents within 20 days, it moved for and issued default final orders. Although a single notice of violation had been issued to respondents jointly and severally, the default final orders were issued to respondents separately: to Niemi on October 11 and to ETU on October 16. Again, DEQ served Bechtolt, but not Bakalian.

---

[3] The notice of violation was entitled "Notice of Violation, Department Order and Assessment of Civil Penalty." (Capitalization omitted.) It stated that it was issued pursuant to ORS chapters 183 and 468, ORS 465.200 to 465.455, ORS 466.706 to 466.845, and OAR chapter 340, divisions 11 and 12.

Bakalian first learned of the default final orders when a consultant notified him of the penalty sometime between October 18 and October 23, prompting him to contact DEQ for copies of the documents on October 23. Respondents then attempted to obtain a hearing by submitting an answer and late request for hearing on October 31. In their request, they contended that Bechtolt, in fact, had written to timely request a hearing; that DEQ had failed to serve Bakalian; and that therefore they were making the late request because of circumstances beyond their reasonable control, as provided in administrative rules applicable to late hearing requests. In answer to the notice of violation, they responded to DEQ's allegations and offered affirmative defenses. DEQ concluded that respondents did not have good cause for failing to file a timely answer and, accordingly, on November 26, denied the late hearing request.

Respondents petitioned for reconsideration on December 23.[4] In the petition, respondents sought reconsideration of the October 11 default final order and the November 26 order denying the late hearing request. DEQ denied that petition on January 29, 2003. On March 31, 2003, respondents filed a petition for judicial review.

Before this court, respondents "seek relief from [DEQ's] entry of the January 29, 2003, Final Order and [DEQ's] underlying [final default orders] imposing a $126,522 civil penalty, plus interest, jointly and severally against [r]espondents." Respondents contend that DEQ erred in the following three ways: (1) by failing to serve the notice of violation on respondents' counsel, as respondents contend that ORS 183.470(3) requires; (2) by failing to serve counsel with the notice of violation and motions for default,[5] as they contend that due process requires; and (3) by denying respondents' late request for hearing and answer and their subsequent petition for reconsideration.

---

[4] That petition is entitled "Petition for Reconsideration of DEQ's Notice of Violation, Department Order and Assessment of Civil Penalty, Findings of Fact, Conclusions of Law and Final Order; Denial of Late Hearing Request and Answer, and Final Order." (Capitalization omitted.)

[5] According to DEQ, the "motions" for default are *pro forma* internal documents to generate the default final orders.

■     We begin by examining our jurisdiction. In this case, the substantive issues and jurisdictional issues overlap because the requirements for proper service under the Administrative Procedures Act (APA), ORS chapter 183, affect the timeliness of respondents' petition for judicial review. The timeliness of the petition for judicial review is jurisdictional. ORS 183.482(1), which confers jurisdiction upon this court to review final orders in contested cases, provides:

> "Jurisdiction for judicial review of contested cases is conferred upon the Court of Appeals. Proceedings for review shall be instituted by filing a petition in the Court of Appeals. *The petition shall be filed within 60 days only following the date the order upon which the petition is based is served unless otherwise provided by statute.* If a petition for rehearing has been filed, then the petition for review shall be filed within 60 days only following the date the order denying the petition for rehearing is served. If the agency does not otherwise act, a petition for rehearing or reconsideration shall be deemed denied the 60th day following the date the petition was filed, and in such cases, petition for judicial review shall be filed within 60 days only following such date. Date of service shall be the date on which the agency delivered or mailed its order in accordance with ORS 183.470."

(Emphasis added.)

We construe statutes using the familiar method of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). To determine the legislature's intent, we begin by examining the statute's text, giving words of common usage their plain meaning. *Id.* at 610-11. If the legislative intent is unambiguous, we stop at that first level of analysis. *Id.* at 611.

Here, respondents seek review of the default final orders and the denial of their late request for hearing. We first consider the timeliness of the petition for judicial review of the default final orders, which were dated October 11 and 16, 2002. Unless the time for filing a petition for judicial review was tolled or unless, for some reason, DEQ's default final orders were not actually final orders, respondents were

required to file any petition for judicial review by December 10 and 16, 2002. They did not do so until March 31, 2003.

Respondents' only effective action before December 16 was their submission on October 31 of an answer and late request for hearing, which DEQ denied on November 26. We must determine, therefore, whether respondents' answer and late request for hearing constituted a petition for rehearing or reconsideration that, pursuant to ORS 183.482(1), would toll the time for filing a petition for judicial review. We conclude that it was not. Indeed, we note that respondents themselves assert that DEQ's November 26 order denying a late hearing "is separate and distinct from the earlier default orders in that it was addressing a completely different issue, that being whether a late hearing is appropriate under [applicable rules]."

In the terms of ORS 183.482(1), the answer and late request for hearing did not constitute a petition for *re*hearing; rather, it was a request to open the record and hold a *first* hearing. Such a request does not fit within the plain meaning of "rehearing." *See Webster's Third New Int'l Dictionary* 1914 (unabridged ed 2002) (defining "rehearing" as "a second or new hearing (as of a trial or an argument on appeal) by the same tribunal and upon the pleadings and depositions already in the case").

Nor was the late request for hearing a petition for reconsideration. Respondents requested that DEQ open the record, allow them to file an answer, and conduct a hearing. That does not fit the plain meaning of "reconsideration." *See Webster's* at 1897 (defining "reconsider" as "to consider again: as **a :** to think over, discuss, or debate (as a plan, decision) esp. with a view to changing or reversing * * *[;] **b :** to take up again (as a motion or vote previously acted on) in a meeting (as a legislative assembly)"). Accordingly, the answer and late hearing request did not toll the time for filing a petition for judicial review of the default final orders.

■    We next consider when the default final orders became final orders, triggering the time for filing a petition for judicial review. Respondents contend that the default final orders were not final until served on counsel on October 23 and that their December 23 petition for reconsideration

thus timely tolled the period for filing a petition for judicial review. Respondents point out that ORS 183.482(1) provides that the time for filing a petition for judicial review, subject to tolling by the filing of a petition for rehearing or reconsideration, is based on the date of service of the final order "in accordance with ORS 183.470." ORS 183.470(3) provides that "[t]he agency shall notify the parties to a proceeding of a final order by delivering or mailing a copy of the order and any accompanying findings and conclusions to each party *or, if applicable, the party's attorney of record.*" (Emphasis added.) Respondents construe the phrase "if applicable" to impose a condition that final orders must be served on counsel whenever a party has an attorney of record. Therefore, respondents conclude, the time for filing a petition for judicial review did not begin to run until their attorney was served with the default final orders.

Without expressing any opinion of that construction of ORS 183.470(3), we observe that service of orders assessing civil penalties is specifically addressed[6] by ORS 183.745, which provides, in part:

"(1) Except as otherwise provided by law, an agency may only impose a civil penalty as provided in this section.

"(2) * * * A person against whom a civil penalty is to be imposed shall be served with a notice in the form provided in ORS 183.415. *Service of the notice shall be accomplished in the manner provided by ORS 183.415.*

"(3) The person to whom the notice is addressed shall have 20 days from the date of service of the notice provided for in subsection (2) of this section in which to make written application for a hearing. The agency may by rule provide for a longer period of time in which application for a hearing may be made. *If no application for a hearing is made within the time allowed, the agency may make a final order imposing the penalty. A final order entered under this subsection need not be delivered or mailed to the person against whom the civil penalty is imposed.*"

---

[6] *See* ORS 174.020(2) ("When a general and particular provision are inconsistent, the latter is paramount to the former so that a particular intent controls a general intent that is inconsistent with the particular intent.").

(Emphasis added.) On its face, ORS 183.745 thus provides that when final orders assessing civil penalties are taken by default, the default final orders need not be served, so long as the service of the initial notice was provided in accordance with ORS 183.415.[7]

That construction of ORS 183.745, however, must be reconciled with ORS 183.482(1), which, as noted, makes the time for filing a petition for judicial review dependent on the date that the final order was served "in accordance with ORS 183.470." ORS 183.745(3) and ORS 183.470(3) impose very different service requirements, and, to determine the time for filing a petition for judicial review, we must resolve that apparent statutory inconsistency.

This court resolved a similar inconsistency in *SAIF v. Glubrecht*, 156 Or App 339, 967 P2d 490 (1998). There, the issue was the timeliness of a petition for judicial review of an order that, by operation of ORS 183.464,[8] became final 30 days after service of the proposed order and was not re-served when it became final. 156 Or App at 344. After examining possible approaches to resolving the statutory inconsistencies between the requirements of ORS 183.464 and ORS 183.482, we concluded in *Glubrecht* that the time for filing a petition for judicial review under ORS 183.482 was based on the date that the proposed order became final, without any requirement of reservice, despite the language in ORS 183.482(1) that makes the time for filing a petition for judicial review dependent on the date that the final order was served in accordance with ORS 183.470. *Id.* at 346-47. In

---

[7] Curiously, the parties cited ORS 183.745(1) and (2), but not (3). However, "the parties may not prevent a court from noticing and invoking an applicable statute by relying only on other sources of law." *Miller v. Water Wonderland Improvement District*, 326 Or 306, 309 n 3, 951 P2d 720 (1998).

[8] ORS 183.464 provides, in part:

"(1) Except as otherwise provided in subsections (1) to (4) of this section, unless a hearing officer is authorized or required by law or agency rule to issue a final order, the hearing officer shall prepare and serve on the agency and all parties to a contested case hearing a proposed order, including recommended findings of fact and conclusions of law. The proposed order shall become final after the 30th day following the date of service of the proposed order, unless the agency within that period issues an amended order."

doing so, we noted that "ORS 183.482(1) itself expressly contemplates exceptions to [the] general principle" that a petition for judicial review must be filed within 60 days of service of the order by including the qualifier, "unless otherwise provided by statute." *Id.* at 346.

We can see no reason that the result here should be different. Accordingly, the time for filing a petition for judicial review under ORS 183.482 was based on the dates of the default final orders, not on the date of service in accordance with ORS 183.470. DEQ's failure to serve the default final orders on respondents' attorney, therefore, did not affect the orders' finality, so long as DEQ complied with the requirements of ORS 183.745 in serving the original notice of violation.

We conclude that, as required by ORS 183.745, DEQ served the notice in accordance with ORS 183.415. Respondents do not contend that the notice had substantive flaws; they argue only that the notice was not properly served. ORS 183.415 provides, in part:

"(1)   In a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice, served personally or by registered or certified mail.

"* * * * *

"(3)   Parties may elect to be represented by counsel and to respond and present evidence and argument on all issues involved."

Despite respondents' attempt to read service requirements into ORS 183.415(3), that provision does not impose any service requirements beyond those established by ORS 183.415(1); it merely provides that respondents could "elect to be represented by counsel." ETU and Niemi were served by certified mail to their registered agent. Under ORS 60.121(1), a registered agent is "an agent of the corporation upon whom any process, notice or demand required or permitted by law to be served upon the corporation may be served." Although service on a party's attorney is sufficient to satisfy the notice requirements of ORS 183.415, *Lolley v. SAIF*, 141 Or App 281, 917 P2d 1067 (1996), the statute does not require service on the attorney. By serving notice on respondents' registered

agent by certified mail, DEQ satisfied the service requirement of ORS 183.415.

We also conclude that there is substantial evidence to support DEQ's finding that it did not receive a timely request for hearing and that, therefore, respondents did not "make written application for a hearing" so as to prevent a default final order from being taken under ORS 183.745. *See* ORS 183.745(3); *former* OAR 340-011-0107(1)[9] (providing that, unless an answer is not legally required or is waived, a person served with notice has 20 days "to file with [DEQ] a written answer and a request for hearing unless another timeframe is required by statute or rule"). As noted, respondents assert that their registered agent, Bechtolt, wrote a letter dated October 1 in which he requested that DEQ hold a hearing and direct all information to Bakalian. With their late hearing request, respondents submitted a copy of that letter and Bakalian's declaration that he "was informed that [Bechtolt] sent a letter to DEQ on October 1 * * *." However, DEQ found that it had not received Bechtolt's letter, and respondents do not explicitly argue that DEQ lacked substantial evidence for that finding. Rather, they contend that Bechtolt reasonably believed that DEQ had received his letter and that DEQ, having failed to hold a hearing on their late request for hearing and having concluded that service on their counsel was not required, "issued inadequate findings of fact and conclusions of law regarding service" on respondents and their attorney. They contend that DEQ should have held a hearing to determine whether DEQ received but mishandled the Bechtolt letter.

The relevant standard for reviewing DEQ's factual finding is set forth in ORS 183.482(8)(c), which provides that "[s]ubstantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." Here, the record includes statements by a DEQ enforcement official that DEQ did not timely receive a written answer and request for hearing. The record thus contains evidence both that Bechtolt sent a letter

---

[9] That version of the rule was certified effective on July 21, 2000. The rule was amended and renumbered to OAR 340-011-0530 effective December 12, 2003.

to DEQ and that DEQ did not receive the letter. On this record, a reasonable person could conclude that DEQ did not receive the letter.[10]

■     We turn to respondents' final argument concerning the sufficiency of the default final orders. Respondents contend that their due process rights were violated by DEQ's failure to serve their counsel until after entry of the default final orders and that the orders were therefore void. We disagree. "Due process requires the *opportunity* to be heard at a meaningful time and in a meaningful manner." *Cole / Dinsmore v. DMV*, 336 Or 565, 588, 87 P3d 1120 (2004) (citing *Mathews v. Eldridge*, 424 US 319, 333, 96 S Ct 893, 47 L Ed 2d 18 (1976)) (emphasis added). The notice of violation provided respondents with an opportunity to be heard by explicitly stating that respondents were entitled to a hearing so long as DEQ received a request for a hearing within 20 days. Respondents simply failed to take advantage of that opportunity. *See Bennett v. Board of Optometry*, 125 Or App 66, 71, 865 P2d 362 (1993), *rev den*, 318 Or 582 (1994) (holding that an optometrist contesting the revocation of his license was not denied his procedural due process rights where he was given the opportunity for a hearing but failed to request one within the deadline period).

To summarize, the time for seeking judicial review of the default final orders began on October 11 and 16 and ended on December 10 and 16. Respondents did not seek judicial review or take action to toll the time for seeking review by petitioning for reconsideration or rehearing during the applicable period. Because DEQ adequately served the notice of violation and the default final orders, the orders were final. Respondents' petition for judicial review of the default final orders therefore was untimely. We lack jurisdiction over that

---

[10] Nor did DEQ's rules require a hearing to examine what happened to Bechtolt's letter. At the relevant time, DEQ's rules provided that "[a] late hearing request may be accepted by [DEQ] if [it] determines that the cause for the late request was beyond the reasonable control of the person." *Former* OAR 340-011-0107(3). The rules also provided that, in deciding whether to grant such a request, DEQ "may conduct such further inquiry as it deems appropriate." OAR 137-033-0528(1)(c). Those rules did not require further inquiry here. Accordingly, DEQ did not act outside the range of its discretion in failing to hold a hearing.

portion of the petition for judicial review and therefore dismiss it.

■ We turn to respondents' petition for judicial review of DEQ's denial of their late hearing request.[11] DEQ has discretion to grant a late hearing under certain circumstances. The rule that was effective during the relevant period provided that "[a] late hearing request may be accepted by [DEQ] if [it] determines that the cause for the late request was *beyond the reasonable control* of the person." *Former* OAR 340-011-0107(3) (emphasis added). We must uphold an agency's interpretation of its own rule if that interpretation is plausible and is "not inconsistent with 'the wording of the rule itself, or with the rule's context, or with any other source of law' * * *." *Glubrecht*, 156 Or App at 353 (quoting *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119

---

[11] Respondents' petition for judicial review of the final order denying their late hearing request is timely. Nevertheless, citing *Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 919 P2d 1172 (1996), DEQ argues that respondents' challenge to the denial order is moot because the underlying default final orders can no longer be challenged on judicial review. That argument overlooks the difference between judicial review of an agency's order and an agency's discretion to reconsider its own order. Although the default final orders could not be challenged through a petition for judicial review, DEQ could decide to withdraw or modify its own orders. *See Boydston v. Liberty Northwest Ins. Corp.*, 166 Or App 336, 340, 999 P2d 503, *rev den*, 331 Or 191 (2000) (an agency's "authority to withdraw and reconsider a decision inheres in the legislative delegation of power to decide a matter and is plenary in the absence of express legislative limitation"). Limitations on withdrawal and reconsideration of orders exist, for example, when a statute specifies that a decision becomes final after a specified period, but not when a statute simply sets a deadline for making a decision. *Id.* at 341.

DEQ points to no statutes limiting its ability to reconsider its orders. Our own review of the statutes leads us to ORS 183.482(6), which provides, in part, that, "[a]t any time subsequent to the filing of the petition for review and prior to the date set for hearing the agency may withdraw its order for purposes of reconsideration." We read that provision as limiting the time during which an agency may withdraw and reconsider an order while the order is the subject of a petition for judicial review, not as limiting an agency's ability to reconsider its order when that order is *not* subject to judicial review.

Here, respondents made their late hearing request before filing a petition for judicial review and before the expiration of time for seeking judicial review of the default final orders. If respondents were successful in obtaining a reversal of DEQ's final order denying their late hearing request, any such hearing would be held at a time when no petition for judicial review of the underlying default final orders was pending. DEQ would thus be able to reconsider the underlying default final orders, even though those orders could not be challenged on judicial review. A late hearing thus could have a practical effect on respondents' rights, and their petition for judicial review of the final order denying their late hearing request is not moot.

(1994)). We conclude that DEQ's interpretation of its rule is plausible.

Respondents contend that their failure to request a hearing within 20 days of their receipt of the notice of violation was "beyond [their] reasonable control" because (1) DEQ did not serve petitioners' attorney with the notice of violation, and (2) Bechtolt timely mailed a letter requesting a hearing. However, we cannot say that, as a matter of law, the late hearing request was "beyond the reasonable control" of respondents. First, DEQ's failure to serve respondents' attorney with the notice of violation is of no consequence because, as discussed above, no statute or rule required DEQ to do so. It was not "beyond the reasonable control" of respondents likewise to respond to DEQ's notice of violation simply because it was sent to respondents' registered agent rather than to their attorney.[12] DEQ can perhaps be criticized for failing to serve Bakalian after he requested service and for failing to inform Bakalian of the notice of violation when his communications with DEQ suggested that he was unaware of it[13]—but no statute required DEQ to act differently, and we cannot reverse DEQ's orders simply because we believe that a different course of action would have been preferable. *See* ORS 183.482(8). DEQ did properly serve respondents, and there is no dispute that respondents received notice of their right to a contested case hearing and the need to ensure that DEQ received a request for hearing within 20 days.

Second, with regard to Bechtolt's letter containing the request for hearing, it was within respondents' reasonable control to ensure that the letter was timely received. For example, they could have informed their attorney of the notice and default order, sent the request for hearing by means of some traceable form of delivery, contacted DEQ

---

[12] We observe that, although DEQ had sent Bakalian copies of previous documents that it directed to respondents, nothing in the record suggests that DEQ promised to serve Bakalian or that it misled respondents by indicating that it had sent copies of the notice of violation to Bakalian.

[13] Bakalian sent DEQ a letter after the notice of violation was served on Niemi, expressing thanks for a meeting and acting as though resolution of the matter was progressing. The letter contains no mention of the earlier notice of violation and threat of civil penalty, and suggests that he was unaware of the enforcement proceeding.

to confirm receipt of the request for hearing, or informed Bakalian of the request before the period for filing it timely had passed. Because respondents' failure to request a hearing in a timely manner was not beyond their reasonable control, DEQ did not err in denying their request for a late hearing.

Petition for judicial review dismissed as to default final orders dated October 11 and 16, 2002; affirmed as to final orders dated November 26, 2002, and January 29, 2003.