Argued and submitted March 6, decision of Court of Appeals reversed; orders of Department of Environmental Quality reversed, and case remanded to Department of Environmental Quality for further proceedings June 28, 2007

## ETU, Inc.,
an Oregon corporation,
and Ed Niemi Oil Company, Inc.,
an Oregon corporation,
*Petitioners on Review,*

*v.*

## ENVIRONMENTAL QUALITY COMMISSION,
*Respondent on Review.*

(DEQ LQ/T-NWR-02-096; CA A121106; SC S53634)

162 P3d 248

Allan B. Bakalian, of Hanson Baker Ludlow Drumheller P.S., Bellevue, Washington, argued the cause and filed the brief for petitioners on review.

Brendan C. Dunn, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before, De Muniz, Chief Justice, and Gillette, Durham, Balmer, Kistler, and Walters, Justices.**

GILLETTE, J.

** Linder, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

This is an administrative law case involving a Department of Environmental Quality (DEQ) final order assessing civil penalties against ETU, Inc. (ETU) and Ed Niemi Oil Company, Inc. (Niemi) (collectively, respondents[1]). The issues presented are whether DEQ erred in choosing to serve a notice of violation and subsequent default orders only on respondents' registered agent, rather than also serving them on their lawyer, Bakalian. A derivative issue involves whether, if the manner of service was not itself error, DEQ nonetheless erred in denying respondents' late request for a hearing, when the request arose out of DEQ's failure to provide Bakalian with copies of the notice and orders in question. The Court of Appeals concluded that respondents did not timely seek judicial review of the default orders and, therefore, the Court of Appeals lacked jurisdiction over that part of the case. It also held that DEQ did not abuse its discretion, and therefore did not err, in denying respondents' late request for a hearing. *ETU, Inc. v. Environmental Quality Commission*, 205 Or App 282, 134 P3d 1019 (2006). For the reasons that follow, we reverse the decision of the Court of Appeals.

The facts of this case are mainly undisputed and are adequately set out in the Court of Appeals opinion. We quote them here:

"Niemi owns a gas station, and ETU owns the gas station's underground storage tanks. In February 1999, while Niemi and ETU were upgrading the underground storage tanks, petroleum product was discovered in the soil and groundwater in the area surrounding the tanks; such uncontained petroleum is referred to as 'free product.' In March 1999, DEQ issued respondents a notice of noncompliance, requesting that they, among other actions, engage in removal of the free product. In the ensuing three years, respondents failed to conduct free product removal to DEQ's satisfaction.

---

[1] Although ETU and Niemi were petitioners in the Court of Appeals, the Court of Appeals referred to them in its opinion below as "respondents." For ease of reference, we do the same, notwithstanding that ETU and Niemi are petitioners in this court as well.

"In early 2002, respondents retained their current attorney, Bakalian. In April of that year, Bakalian notified DEQ that he would be representing respondents with regard to the contamination of the area around the gas station. That same month, DEQ issued respondents a second notice of noncompliance for failing to conduct free product removal; DEQ served Bakalian with a copy of the notice. Following that notice, respondents conducted free product removal on a regular basis.

"In August 2002, Bakalian met with DEQ representatives to discuss the status of the second notice of noncompliance issued against respondents. At that meeting, the DEQ representatives indicated that DEQ was in the process of [assessing] penalties against respondents for several alleged past violations. Bakalian gave one of them his business card and requested that he be notified of any actions taken against respondents.

"On September 19, 2002, DEQ issued respondents, jointly and severally, a notice of violation assessing a civil penalty in the amount of $126,522.* * * The notice of violation indicated that it would become final 'by operation of law without any further action or proceeding' unless DEQ received a request for a hearing on the matter, accompanied by a written answer to allegations made in the notice, within 20 days. Despite Bakalian's earlier request, DEQ did not serve the notice on Bakalian. Instead, DEQ served respondents' registered agent, Bechtolt (who was also Niemi's president), by certified mail with return receipt.

"Although Bechtolt wrote a letter dated October 1 requesting that DEQ hold a hearing and send all information pertaining to the matter to Bakalian, DEQ found that it never received that letter. Because DEQ did not receive a response from respondents within 20 days, it * * * issued default final orders. Although a single notice of violation had been issued to respondents jointly and severally, the default final orders were issued to respondents separately: to Niemi on October 11 and to ETU on October 16. Again, DEQ served Bechtolt, but not Bakalian.

"Bakalian first learned of the default final orders when a consultant notified him of the penalty sometime between October 18 and October 23, prompting him to contact DEQ for copies of the documents on October 23. Respondents then attempted to obtain a hearing by submitting an

answer and late request for hearing on October 31. In their request, they contended that Bechtolt, in fact, had written to timely request a hearing; that DEQ had failed to serve Bakalian; and that therefore they were making the late request because of circumstances beyond their reasonable control, as provided in administrative rules applicable to late hearing requests. In answer to the notice of violation, they responded to DEQ's allegations and offered affirmative defenses. DEQ concluded that respondents did not have good cause for failing to file a timely answer and, accordingly, on November 26, denied the late hearing request.

"Respondents petitioned for reconsideration on December 23.* * * In the petition, respondents sought reconsideration of the October 11 default final order and the November 26 order denying the late hearing request. DEQ denied that petition on January 29, 2003. On March 31, 2003, respondents filed a petition for judicial review."

205 Or App at 284-86 (footnotes omitted).

In their petition for judicial review in the Court of Appeals, respondents sought relief from the January 29, 2003, final order as well as from the underlying default final orders assessing the civil penalty, arguing that DEQ had erred by failing to serve the notice of violation on Bakalian, by failing to serve counsel with the notices of default, and by denying their late request for a hearing and subsequent petition for reconsideration.

The Court of Appeals began its analysis by noting that its jurisdiction over such matters is governed by ORS 183.482(1), which confers jurisdiction on the Court of Appeals to review final orders in contested cases. That statute provides:

"Jurisdiction for judicial review of contested cases is conferred upon the Court of Appeals. Proceedings for review shall be instituted by filing a petition in the Court of Appeals. *The petition shall be filed within 60 days only following the date the order upon which the petition is based is served unless otherwise provided by statute.* If a petition for rehearing has been filed, then the petition for review shall be filed within 60 days only following the date the order denying the petition for rehearing is served. If the agency

does not otherwise act, a petition for rehearing or reconsideration shall be deemed denied the 60th day following the date the petition was filed, and in such cases, petition for judicial review shall be filed within 60 days only following such date. *Date of service shall be the date on which the agency delivered or mailed its order in accordance with ORS 183.470.*"

(Emphases added.) The court first addressed the timeliness of respondents' petition for review of the October 11 and 16, 2002, final default orders under that statute. The court observed that, under ORS 183.482(1), respondents' petitions for judicial review of those default final orders were required to be filed by December 11 and 16, 2002, respectively, unless the time for filing the petitions was tolled for some reason. Respondents did not file any petition for judicial review of the default final orders until March 31, 2003, and the Court of Appeals found no basis for concluding that the period for filing had been tolled. The Court of Appeals therefore held that the petition was untimely with respect to those orders. *ETU*, 205 Or App at 293.

In so concluding, the court rejected respondents' argument that the default final orders were not final until they were served on counsel on October 23, 2002, and that respondents' December 23 petition for reconsideration thus timely tolled the filing period for filing a petition for judicial review. The court noted that ORS 183.745 specifically addresses service of orders assessing civil penalties and, under that statute, default final orders assessing civil penalties need not be served at all, "so long as service of the initial notice [of the assessment of the civil penalty] was provided in accordance with ORS 183.415," *ETU*, 205 Or App at 290. ORS 183.745 provides, in part:

"(1)   Except as otherwise provided by law, an agency may only impose a civil penalty as provided in this section.

"(2)   A civil penalty imposed under this section shall become due and payable 10 days after the order imposing the civil penalty becomes final by operation of law or on appeal. *A person against whom a civil penalty is to be imposed shall be served with a notice in the form provided in ORS 183.415. Service of the notice shall be accomplished in the manner provided by ORS 183.415.*

"(3)  The person to whom the notice is addressed shall have 20 days from the date of service of the notice provided for in subsection (2) of this section in which to make written application for a hearing. The agency may by rule provide for a longer period of time in which application for a hearing may be made. *If no application for a hearing is made within the time allowed, the agency may make a final order imposing the penalty. A final order entered under this subsection need not be delivered or mailed to the person against whom the civil penalty is imposed.*"

(Emphases added.) The court then concluded that when, as here, the agency had not received a request for a hearing within 20 days of the service of the initial notice, no source of law required the tolling for which petitioners argued. *ETU*, 205 Or App at 290-92.

Two ancillary issues remained respecting this aspect of the case. Concerning the first—Bechtolt's letter requesting a hearing—the Court of Appeals concluded that substantial evidence supported DEQ's finding that it had not received that request.[2] *Id.* at 292. Second, the Court of Appeals concluded that service of the initial notice of the assessment of the civil penalty was proper because ORS 183.415 does not require service on a party's lawyer. *Id.* at 291-92.

With those conclusions in mind, the Court of Appeals then resolved the apparent conflict between ORS 183.482(1), which provides that petitions for judicial review are to be filed "within 60 days only following the date the order upon which the petition is based is served," and ORS 183.745(3), which provides that final orders assessing civil penalties "need not be delivered or mailed to the person against whom the civil penalty is imposed." The court held that, in cases like the present, in which an order becomes final by operation of law and not upon service of the order, the time for filing a petition for judicial review under ORS 183.482 is based on

---

[2] Respondents argue that the statutory requirement in ORS 183.745(3) of 20 days in which to "make written application" for a hearing does not import any requirement that such written application actually be received by the agency within 20 days and that DEQ exceeded its authority in making a rule purporting to impose such a requirement. Because we ultimately conclude that DEQ erred in failing to grant respondents a hearing in response to respondents' October 31, 2002, request, we need not address that question here.

the date of the final order and not on any date of service of that order. *Id.* at 291. Finally, the court concluded that, because respondents had not sought judicial review or taken any other action to toll the time for seeking review during the applicable period, the default orders became final when they were issued and respondents' petition for judicial review with respect to them was untimely. Based on that conclusion, the Court of Appeals held that it did not have jurisdiction over that part of the petition for judicial review and dismissed it. *Id.* at 293-94.

The Court of Appeals then turned to respondents' argument that, even if their petition for judicial review of the default orders was untimely, DEQ had abused its discretion in denying respondents' late hearing request. The court began by noting that the DEQ rule in effect during the relevant time period gave DEQ discretion to grant late hearing requests under certain circumstances:

> "A late hearing request may be accepted by [DEQ] if [it] determines that the cause for the late request was beyond the reasonable control of the person."

*Former* OAR 340-011-0107(3) (2000).[3] Respondents argued that the cause of their failure to file a request for a hearing within 20 days of receipt of the notice of violation was beyond their reasonable control because (1) DEQ did not serve that notice on their lawyer; and (2) although their registered agent, Bechtolt, timely mailed a letter requesting a hearing, DEQ unaccountably did not receive it.[4] The Court of Appeals rejected both arguments. The court reiterated that DEQ's failure to serve respondents' lawyer was "of no consequence," in light of its earlier conclusion that "no statute or rule required DEQ to do so." *ETU*, 205 Or App at 295. Finally, the court also held that it was within Bechtolt's reasonable control to ensure that DEQ timely received the letter requesting a hearing. For example, the court noted, Bechtolt might have sent the request with some traceable form of delivery, contacted DEQ to make sure the request had been received, or

---

[3] That rule was amended and renumbered, effective December 2003, as OAR 340-011-0530(4).

[4] As we understand DEQ's position, the agency does not dispute that Bechtolt mailed the request.

informed Bakalian of the notice. *Id.* at 295-96. Accordingly, the court concluded, DEQ did not abuse its discretion in refusing to grant respondents' late request for a hearing. *Id.* at 296. We allowed respondents' petition for review.

We approach this case slightly differently than did the Court of Appeals. That is, before considering the timeliness and propriety of *respondents'* actions in response to various DEQ orders, we begin by considering, first, the propriety of DEQ's actions in light of the laws governing that agency. As the Court of Appeals observed, DEQ imposed a civil penalty on respondents under ORS 183.745. As noted earlier, subsection (1) of that statute provides that, "[e]xcept as otherwise provided by law, an agency may only impose a civil penalty as provided in this section." The first question, then, is whether DEQ, in fact, imposed a civil penalty as provided in ORS 183.745.

Subsection (2) of ORS 183.745 provides, in part:

"A person against whom a civil penalty is to be imposed shall be served with a notice in the form provided in ORS 183.415. Service of the notice shall be accomplished in the manner provided by ORS 183.415."

ORS 183.415, in turn, provides, in part:

"(1)   In a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice, served personally or by registered or certified mail.

"(2)   The notice shall include:

"(a)   A statement of the party's right to hearing, or a statement of the time and place of the hearing;

"(b)   A statement of the authority and jurisdiction under which the hearing is to be held;

"(c)   A reference to the particular sections of the statutes and rules involved; and

"(d)   A short and plain statement of the matters asserted or charged.

"(3)   Parties may elect to be represented by counsel and to respond and present evidence and argument on all issues involved."

The parties do not dispute that DEQ served respondents with a notice "in the form" or "in the manner" provided in ORS 183.415. That is, they do not dispute that the September 19, 2002, notice of violation contained the information required in subsection (2) of ORS 183.415 or that it was "served personally or by registered or certified mail" as required in subsection (1). Rather, they dispute whether ORS 183.745, ORS 183.415, or any other statute required DEQ to serve that notice on respondents' counsel, Bakalian.

As noted, the Court of Appeals concluded that ORS 183.415(3), which provides that a party "may elect to be represented by counsel," "does not impose any service requirements beyond those established by ORS 183.415(1)." *ETU*, 205 Or App at 291. That is correct, as far as it goes: ORS 183.415(3) does not expressly require service on counsel if a person elects to be represented by counsel. But ORS 183.415(1) requires that "all parties shall be afforded an opportunity for hearing after reasonable notice, served personally or by registered or certified mail." That passage of the statute at least leaves open the question whether a party may elect to be served through service on counsel and whether an agency thereafter would commit legal error by failing to serve counsel.

■■ In our view, however, that question may be left for another day. Whatever the sweep of ORS 183.415(3), when an agency has actual knowledge that a person is represented by counsel, that knowledge triggers certain obligations on the part of the agency and certain rights in the represented person. After receiving information that a party is represented by a lawyer, an agency rightfully may presume that the lawyer has authority to speak on behalf of the party on all matters pertaining to the representation. By the same token, a party, having elected to be represented by a lawyer, is entitled to rely on the lawyer to deal with the agency on its behalf and to expect the agency to deal with the lawyer. It follows that, when a represented person has notified the agency that he or she is being represented by counsel in a matter, the agency then has a duty to provide the lawyer with copies of all important communications with the person, in addition to any required service on the person. And the represented person has a right to rely on the agency to do so, particularly

after the lawyer specifically has requested to be kept so informed.

■ In this case, DEQ knew, long before it issued its September 19, 2002, notice of violation, that Bakalian represented respondents in the matter. It is undisputed that Bakalian notified DEQ by letter in April 2002 that respondents had hired him to represent them in the instant proceeding. In addition, in August 2002, Bakalian again specifically requested that DEQ notify him concerning any developments in the matter.[5] Having permissibly chosen to be represented by counsel, respondents were entitled to rely on their lawyer to deal on their behalf with DEQ and, equally, had a right to require DEQ, in addition to whatever else the law might require it to do respecting them, to keep their lawyer informed. DEQ's failure to do so violated respondents' right to representation by counsel under ORS 183.415(3). To the extent that the Court of Appeals reached a contrary conclusion, it erred.

■ We turn to consider the effect of DEQ's failure on DEQ's subsequent actions and on respondents' rights in this proceeding. As noted, DEQ did not provide Bakalian with a copy of the notice of violation, which led to respondents' failure, without the informed assistance of their lawyer, to effectively "make written application" for a hearing within 20 days in accordance with ORS 183.745(3) and DEQ's rules.[6] DEQ's theory is that, despite the foregoing omissions, the notice of violation became final by operation of law and, in accordance with ORS 183.745(3), the default final orders that DEQ issued on October 11 and 16, 2002, imposing civil penalties on respondents were valid.

We think that the foregoing argument by DEQ misses the true point of the case, which is the issue of the late

---

[5] And DEQ did, in fact, keep Bakalian apprised of developments, up until the September 19, 2002, notices of violation, which it inexplicably failed to serve on Bakalian.

[6] We accept for purposes of this opinion that DEQ's interpretation of *former* OAR 340-011-0107(1) (2000), which provides that a person has 20 days "in which to file" an answer, as requiring requests for a hearing to be *received* within 20 days, is consistent with the requirement in ORS 183.745(3) that a party "make written application" within 20 days. We need not and therefore do not decide that question here.

hearing request. A few days after receiving the default final orders, on October 31, 2002, Bakalian submitted a late request for a hearing under *former* OAR 340-011-0171(3) (2000), which gave DEQ the discretion to grant a late request for a hearing if the "cause for the late request was beyond the reasonable control of the person." DEQ concluded that respondents did not have good cause for failing to file a timely answer and, accordingly, on November 26, denied the late hearing request. Respondents sought reconsideration on December 23, and DEQ ultimately denied that petition on January 29, 2003. On March 31, 2003, respondents filed a petition for judicial review.

As a preliminary matter, we agree with the Court of Appeals that respondents' petition for judicial review of the DEQ denial of their late request for a hearing was timely. As noted, however, the Court of Appeals also held that it could not say, as a matter of law, that the cause of respondents' late request for a hearing was beyond respondents' reasonable control.

In reaching that conclusion, the court first stated that it must uphold an agency's interpretation of its own rule if the interpretation is plausible and not inconsistent with the words of the rule itself, the rule's context, or any other source of law. Applying that standard, the court held that "DEQ's interpretation of its rule is plausible." *ETU*, 205 Or App at 294-95. The problem with that approach is that no deference is due in the present case: The "interpretation" to which the Court of Appeals apparently was referring was not an interpretation at all. It was, instead, an ad hoc determination that the "cause" for late request that respondents proffered was not, in the agency's opinion, beyond respondents' reasonable control. In other words, it was merely an *application* of the agency's rule to a given set of facts. The only question properly before the court, then, was whether DEQ abused its discretion in applying its rule in such a way as to deny respondents' late hearing request.

Respecting that issue, we have no trouble concluding that, as a matter of law, DEQ did abuse its discretion, and therefore erred, in denying respondents' request. We begin with DEQ's choice to ignore Bakalian. We have held that

DEQ erred in failing to provide Bakalian with the notice of violation. That error on DEQ's part was the direct "cause" of the late hearing request, insofar as respondents, having engaged counsel, reasonably could then rely on counsel's expertise in responding to legal notices from DEQ and were not themselves required to understand the intricacies of the agency's procedures. It is undisputable that DEQ's failure to serve respondents' lawyer was beyond respondents' reasonable control.

DEQ argues that the entire problem could have been avoided had Bechtolt either used some form of registered or certified mail or, failing that, had inquired with DEQ to confirm that his request for a hearing had been received. But DEQ's rule, *former* OAR 340-011-0107(1) (2000), which provides only that a person has 20 days "in which to file" an answer, does not expressly require either step. We know that Bechtolt mailed the request for a hearing. That means that either (1) the mail miscarried; or (2) DEQ lost Bechtolt's request. Either of those eventualities also was "beyond the [respondents'] reasonable control."

Having effectively deprived respondents of a reasonable opportunity to request a hearing in a timely fashion, DEQ was not then entitled to use its own omission, and the factual sequellae of that omission, as the basis for its refusal to grant respondents' late request for a hearing. DEQ's "discretion" did not extend so far. Instead, DEQ affirmatively was obliged to rectify its error, when its own rule granted it the power to do so, by allowing respondents a hearing. Failure to do so was error. And, because it was error, it follows that the Court of Appeals erred in affirming DEQ's final order dated November 26, 2002, denying respondents' late hearing request. The case must be remanded to DEQ to hold an appropriate hearing.

The decision of the Court of Appeals is reversed. The orders of the Department of Environmental Quality are reversed, and the case is remanded to the Department of Environmental Quality for further proceedings.