Argued and submitted June 9, reversed September 10, 2003

Brent OWEN
and Redding Foundation, Inc.,
*Petitioners,*

*v.*

DIVISION OF STATE LANDS,
*Respondent.*

A116843

76 P3d 158

Paul V. Vaughan argued the cause for petitioners. With him on the briefs was Hershner Hunter Andrews Neill & Smith, LLP.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

Petitioners Brent Owen and Redding Foundation, Inc. (Redding) seek judicial review of a final order of the Division of State Lands (DSL). The order upheld a cease and desist order that directed petitioners to stop fill activities on a road that spans wetlands located on petitioners' property until they obtained a permit for that work as provided in ORS 196.810(1)(a).[1] Petitioners assert that the work is exempt from the permit requirement under ORS 196.905(4)(b),[2] the statutory exemption for maintenance of certain farm roads, or under ORS 196.905(6),[3] the exemption for maintenance or reconstruction of a dike. Petitioners also seek ancillary relief under ORS 183.486(1)(b). On review for errors of law, ORS 183.482(8)(a), we conclude that petitioners' activities are exempt from the permit requirement under ORS 196.905(4)(b). Accordingly, we reverse.

---

[1] ORS 196.810(1)(a) provides:

"Except as otherwise specifically permitted under ORS 196.600 to 196.905, no person or governmental body may remove any material from the beds or banks or fill any waters of this state without a permit issued under authority of the Director of the Division of State Lands, or in a manner contrary to the conditions set out in the permit, or in a manner contrary to the conditions set out in an order approving a wetlands conservation plan."

Although the 1999 versions of the statutes apply in this case, the 2001 versions of the relevant statutes are identical and will be used for convenience.

[2] ORS 196.905(4) provides, in part:

"Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the following activities on exclusive farm use zoned lands:

"* * * * *

"(b) Maintenance of farm roads in such a manner as to not significantly adversely affect wetlands[.]"

[3] ORS 196.905(6) provides:

"Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the maintenance or reconstruction of structures such as dikes, dams, levees, groins, riprap, tidegates, drainage ditches, irrigation ditches and tile drain systems, provided that:

"(a) The structure was serviceable within the past five years; and

"(b) Such maintenance or reconstruction would not significantly adversely affect wetlands or other waters of this state to a greater extent than the wetlands or waters of this state were affected as a result of the original construction of those structures."

The following historical facts, which were adopted by DSL, are taken from the hearing officer's proposed order. Owen incorporated Redding in 1985 as a nonprofit corporation for the purpose of protecting wetlands. Redding purchased the property in 1987. The property is uninhabited, and it is zoned for exclusive farm use. Owen testified that it consists of approximately two-thirds wetlands and one-third forested land on its "upland" side. The only legal access to the upland portion is over the road that crosses the marsh. Petitioners have used the property primarily to protect wildlife habitat, but they also have used it for livestock grazing, recreation, and forestry activity. Owen also co-owns another parcel of land adjacent to the property. That parcel contains a cabin and can be reached only by means of the road.

The road is approximately 500 feet long and has existed since at least 1978. The road was used in part to facilitate the raising and grazing of cattle on the property. Owen and others used it several times a year. In 1992, Owen did some repair work on the road. It was passable for the use of four-wheel drive vehicles until late 1999 or early 2000, when a portion of it became permanently submerged because of a "silt constriction" in the Williamson River that caused water to accumulate on the property to a greater extent than before. In the fall of 1999, Owen hired a contractor to perform work on the road, but the work could not be commenced until the next year. The work included placing approximately 2,600 cubic yards of fill material on the existing road "footprint," grading out the material on the road, and replacing a culvert. The work was about half completed when a DSL representative instructed Owen to stop the project. DSL issued a cease and desist order on October 20, 2000. Owen requested a hearing in the matter.

A hearing was held on April 3, 2001. On October 16, 2001, DSL issued a final order in which it adopted the hearing officer's factual findings and concluded that no permit exemption applied. Specifically, DSL concluded that, for the purpose of the exemption in ORS 196.905(4)(b), "maintenance" does not include reconstruction. In advancing that interpretation, DSL relied on ORS 196.905(7), which provides:

> "Nothing in ORS 196.800 to 196.900 applies to removal
> or filling, or both, for maintenance, including emergency
> reconstruction of recently damaged parts, of currently serv-
> iceable roads or transportation structures such as groins
> and riprap protecting roads, causeways and bridge abut-
> ments or approaches."

According to DSL, that provision indicates that "[t]he only type of road reconstruction exempt from removal-fill requirements is *emergency* reconstruction of *recently damaged parts* of *currently serviceable roads*" as provided in ORS 196.905(7). (Emphasis in original.) DSL, through its director, concluded:

> "Based on this legal reasoning, I conclude that 'reconstruc-
> tion' would not be exempt from permit requirements in this
> case. Because [the hearing officer] found that Redding's
> road fill included 'reconstruction,' it therefore follows that
> the fill was not exempt from permit requirements. Accord-
> ingly, I uphold the Cease and Desist Order issued to
> Redding."

The final order did not address the other statutory exemptions on which petitioners relied. Petitioners sought judicial review.

On review, petitioners renew their arguments that the proposed roadwork is exempt from the permit requirement of ORS 196.810 under the exemptions provided in ORS 196.905(4)(b) and ORS 196.905(6), respectively. We begin and end our analysis with petitioners' claim under ORS 196.905(4)(b).

Relying in part on the hearing officer's characterization of the work as "repairs," petitioners assert that their "work on the road/dike structure that spans the marsh does *not* involve reconstruction of that structure." (Emphasis in original.) In particular, they assert that the work did not involve removing or replacing the existing roadbed, but rather placing fill on it to restore the road surface. Further, they contend that even if the filling of the inundated portion of the road would include *some* reconstruction, that portion constitutes, at most, only 20 percent of the entire length of the road and that "maintenance," for purposes of ORS 196.905(4)(b) can include such limited reconstruction.

DSL does not dispute that the proposed roadwork constitutes "filling" within the meaning of the statute, that the property is zoned for exclusive farm use, that the road is a farm road, and that the road work would be conducted in a manner so as to not significantly adversely affect wetlands. However, DSL contends, as it did below, that the road work amounts to reconstruction, not maintenance, of the road and, therefore, that petitioners have not satisfied ORS 196.905(4)(b). It contends that the "only reconstruction that qualifies as 'maintenance' in the statute is emergency reconstruction of currently serviceable roads" under ORS 196.905(7).

■ This case turns on the meaning of the term "maintenance" as used in ORS 196.905(4)(b). "When an agency's interpretation or application of a provision of law is at issue, the reviewing court's standard of review depends upon whether the phrase at issue is an exact term, an inexact term, or a delegative term." *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353, 15 P3d 29 (2000) (citing *Springfield Education Assn. v. School Dist.*, 290 Or 217, 223, 621 P2d 547 (1980)). In this case, the disputed term is not exact, nor is it delegative in nature. It "embod[ies] a complete expression of legislative meaning" but is "open to various interpretations." *See Coast Security Mortgage Corp.*, 331 Or at 354. Therefore, it is an inexact term, and we review the agency's interpretation of it as a matter of law, *Springfield Education Assn.*, 290 Or at 227, in accordance with the interpretive principles of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). *Coast Security Mortgage Corp.*, 331 Or at 354; *see also Broadway Deluxe Cab v. Natl. Council on Comp. Ins.*, 133 Or App 324, 329-30, 891 P2d 1326, *rev den*, 321 Or 246 (1995) (holding that "maintain," for purposes of ORS 656.027(14) (1993)—referring to a person who "maintains" equipment—is an inexact term). We begin with the statute's text and context, and we follow the understanding that "words of common usage typically should be given their plain, natural, and ordinary meaning." *PGE*, 317 Or at 611.

The legislature has not defined "maintenance" for purposes of ORS 196.905. As pertinent here, "maintenance" means "the labor of keeping something (as buildings or

equipment) in a state of repair or efficiency : CARE, UPKEEP
* * *." *Webster's Third New Int'l Dictionary* 1362 (unabridged
ed 1993). That definition suggests that the thing being main-
tained has a sound or functional baseline condition and that
the work is being done to keep it in that state. *See id.* at 1923
(defining "repair" as "the state of being in good or sound con-
dition"); *id.* at 725 (defining "efficiency" as "suitability for a
task or purpose"); *id.* at 2517 (defining "upkeep" as the "state
of being maintained in good condition").

Here, the road's baseline state of "repair or effi-
ciency" consisted of a passable, above-water-level roadway
that provided access for cattle and vehicles to the upland por-
tion of the property. That state of repair or efficiency was
impaired by the rise in the water level in the marsh in late
1999, causing a portion of the road to become permanently
submerged. Logic suggests that the work of restoring the
road to an above-water-level state or condition would consti-
tute keeping it in a state of "repair or efficiency." But, there is
a twist. Petitioners do not intend to limit their work to pre-
serving the physical dimensions of the originally existing
roadbed. Instead, they plan to deposit additional fill material
on the existing footprint of the roadway, which would result
in a road that consists of more total material and greater
physical dimension than it previously had contained.

According to DSL, that element of augmentation
makes the project one of reconstruction rather than mainte-
nance. DSL relies on ORS 196.905(6) and(7). As noted, the
latter subsection provides:

> "Nothing in ORS 196.800 to 196.900 applies to removal
> or filling, or both, for *maintenance, including emergency
> reconstruction of recently damaged parts, of currently serv-
> iceable roads* or transportation structures such as groins
> and riprap protecting roads, causeways and bridge abut-
> ments or approaches."

(Emphasis added.) DSL asserts that the use of the term
"reconstruction" in those subsections, but not in ORS
196.905(4)(b), shows that the legislature intended different
meanings for those terms and, thus, "maintenance" cannot
include "reconstruction," or, if it does, it only can include the
type specified in subsection (7).

DSL is correct that, under the applicable rule of statutory construction, we presume that the terms "maintenance" and "reconstruction" have different meanings. *See State v. Guzek*, 322 Or 245, 265, 906 P2d 272 (1995) (where legislature uses different terms in related statutes, the court infers that it intended different meanings). The plain meaning of "reconstruction" is "the action of reconstructing or state of being reconstructed." *Webster's* at 1898. To "reconstruct" is "to construct again: as **a**(1) : to build again : REBUILD ‹*[reconstructing]* destroyed railroads› (2) : to make over : REPAIR ‹*[reconstructed]* the highways that needed it›." *Id.* at 1897. Thus, the plain meanings of the terms overlap to some extent—both involve "repair." Nevertheless, reconstruction typically requires more extensive measures than maintenance. Indeed, reconstruction "presupposes the nonexistence of the thing to be reconstructed, as an entity; that the thing before existing has lost its entity." *Black's Law Dictionary* 1437 (4th ed 1968). Here, the road continued to exist in a physical sense; it was nonexistent only in a functional sense.

In addition to the ordinary meanings of the disputed terms, we must consider their meanings in the relevant statutory context. In particular, ORS 196.905(7) also suggests that the terms overlap to some extent because maintenance, for purposes of that subsection, includes "emergency reconstruction" of "currently serviceable roads." Thus, even if we were to conclude that the proposed work is "reconstruction," the issue remains whether such reconstruction nonetheless qualifies as "maintenance."

DSL asserts, in part, that "the thing that made petitioners' activity reconstruction rather than maintenance or upkeep was that the road was no longer serviceable, given that it was permanently inundated." We disagree that the road's lack of current serviceability precludes the work from constituting "maintenance." The permit requirements of ORS 196.600 to 196.905 apply when a person contemplates filling or removing material from wetlands or the "waters of this state." ORS 196.810.[4] ORS 196.800(5) defines "fill" as the

---

[4] ORS 196.600 to 196.692 relate to activities conducted in wetlands, whereas ORS 196.795 to 196.990 relate to the removal of material from and filling of the waters of this state.

"total of deposits * * * exceeding 50 cubic yards or more of material * * * in any waters of this state." As a corollary, the statutory exemptions from the fill permit requirements, including ORS 196.905(4)(b), *only* apply to projects involving more than 50 cubic yards of material. Typically, the necessity of adding fill to wetlands in order to maintain a road suggests that the road could be inundated or otherwise not currently serviceable. Accordingly, it is not logical to conclude that "maintenance," for purposes of ORS 196.905(4)(b), always requires a currently serviceable farm road.

The statutory text and context support that conclusion. ORS 196.905(4)(b) does not expressly require that a farm road be currently serviceable. However, ORS 196.905(7), the general road maintenance exemption, does include such a requirement. The fact that the legislature did not include a serviceability requirement in subsection (4)(b) evidences the legislature's intention to treat farm roads differently from other roads. *See* ORS 174.010 (admonishing courts "not to insert what has been omitted, or to omit what has been inserted"). Thus, serviceability cannot be the distinguishing feature between maintenance and reconstruction.

Further, ORS 196.905(4)(b), unlike paragraph (6)(b), does not require a petitioner to establish that the maintenance would "not significantly adversely affect wetlands or other waters of this state *to a greater extent than the wetlands or waters of this state were affected as a result of the original construction*" of the farm road. ORS 196.905(6)(b) (emphasis added). Paragraph (4)(b) does not refer to *original* construction.[5] Thus, the legislature apparently did not intend that the

---

[5] The 2001 legislature amended the farm road maintenance exemption to include such a limitation. The new ORS 196.905(4) would provide, in part:

"Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the following activities on exclusive farm use zoned lands:

"* * * * *

"(c) Maintenance of farm roads, provided that:

"(A) The farm roads are constructed and maintained in accordance with construction practices designed to minimize any adverse effects to the aquatic environment;

"(B) Borrow material for farm road maintenance does not come from waters of this state unless authorized by the division; and

"(C) Maintenance activities are confined to the scope of construction for the original project[.]"

effect on wetlands of "maintenance" of a farm road be limited to the effect caused by the original construction of the road.

DSL also asserts that maintenance does not include the restoration of a road that has fallen into a state of disrepair. Assuming without deciding that DSL is correct, petitioners did not allow the road to fall into a state of disrepair over an extended period of time. Owen hired a contractor to perform the proposed work promptly after discovering that the road had become inundated, and the work was commenced at the earliest reasonable opportunity.

■     Finally, DSL asserts that "maintenance" is "an activity limited in scope, for example, activities that simply repair or rehabilitate an existing road by grading, rocking, or repaving. By contrast, 'reconstruction' is more expansive and includes building from the ground up a road that once existed." That argument proves too much. Although the road is partially submerged, it is not physically "nonexistent." Eighty percent of the road is intact, and the remaining length of the road also exists, albeit in a submerged state. Therefore, the proposed work is not reconstruction to the extent that that term connotes the physical nonexistence of the structure being reconstructed. Moreover, the mere fact that the proposed work involves additional fill does not mean that it is not "maintenance." The work only would raise the surface of the road, on its existing footprint, so that it is above the water level to a comparable extent as previously was the case. In so doing, the work would keep the road in a state of repair or efficiency.Ultimately, the issue reduces to whether "maintenance" within the meaning of ORS 196.905(4)(b) is limited to repairs to a farm road that do not involve any meaningful change to its preexisting physical dimensions. The difficulty is that the use of the word in the text and context of the statute does not remove fair doubt about what meaning the

Or Laws 2001, ch 516, § 6.

However, the amendment has a delayed effective date. It will "become operative on January 2 of the even-numbered year following the date the United States Environmental Protection Agency grants authority by letter to the Division of State Lands to administer permits * * * and the Legislative Assembly approves the grant of authority." Or Laws 2001, ch 516, § 11. We express no opinion concerning the proper construction of the 2001 version of the statute should it take effect.

legislature intended. In construing the word "maintain" in a different context, we stated:

> "In essence, the issue is one of degree. Broadway argues that the common meaning of 'maintain' encompasses minor repairs, such as gas, oil and other incidental repairs. SAIF argues that 'to maintain' equipment is to be responsible for keeping the equipment in good working order, including responsibility for major as well as minor repairs. Because either interpretation is reasonable on the face of the statute and in its context, we turn to the legislative history underlying the statute for assistance."

*Broadway Deluxe Cab*, 133 Or App at 330.

The legislative history of ORS 196.905(4)(b) provides limited assistance. The farm road maintenance exemption was enacted as part of a larger bill. *See* Or Laws 1989, ch 837. The exemption itself was not separately addressed during hearings on the bill. However, testimony before the Senate Committee on Water Policy, which considered the bill, reveals that it was designed to ensure that farmers be allowed to continue their existing operations, including keeping existing structures, but not be allowed to expand their activities into new areas. A DSL wetlands policy specialist, Ken Bierley, who was a member of the work group that drafted the bill, recognized the ease with which land could "revert" back to wetlands as well as the fact that the nature of the farming business was such that maintenance of farm structures might not occur on a regular basis. He stated that "the concept that we were working with, in simplistic terms, is that you can use, for agricultural purposes, what you have, you can regain what you've recently lost, and you can maintain those facilities that are necessary for the production." Tape Recording, Senate Committee on Water Policy, SB 3, May 2, 1989, Tape 38, Side A (statement of Ken Bierley, DSL). That testimony, although not specifically tied to the farm road exemption, is consistent with the conclusion that "maintenance" includes restoration to their previously sound and efficacious condition of structures that recently have been lost. Although the relevant legislative history is scant, it supports the conclusion that the proposed work here constitutes farm road maintenance within the meaning of ORS 196.905(4)(b).

Petitioners ask us to "order the DSL to allow Petitioners to complete the maintenance work under the DSL rules in effect on the date the Cease and Desist order was issued" pursuant to our authority under ORS 183.486(1)(b) to "[o]rder such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld." We decline to issue such an order. We will not assume that DSL will "refuse to follow the law by attempting to enforce an order that has been set aside on judicial review." *Teel Irrigation Dist. v. Water Resources Dept.*, 135 Or App 16, 33, 898 P2d 1344 (1995), *aff'd in part, vac'd in part*, 323 Or 663, 919 P2d 1172 (1996).

Reversed.