Argued and submitted June 16, 2005, on appeal, reversed and remanded; affirmed on cross-appeal March 14, 2007

BRIDGEVIEW VINEYARDS, INC.,
an Oregon corporation;
and Robert E. Kerivan,
*Petitioners - Respondents*
*Cross-Appellants,*

*v.*

STATE LAND BOARD
OF THE STATE OF OREGON,
Division of State Lands
of the State of Oregon,
Governor John Kitzhaber,
Paul Cleary, Steven Purchase, Anne Hanus,
Pierre Lumley, Larry Doe,
William Cook and Robert Brown,
*Respondents - Appellants*
*Cross-Respondents.*

Josephine County Circuit Court

99CV0132; A120754

154 P3d 734

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for appellants-cross-respondents. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Clarence H. Greenwood argued the cause for respondents-cross-appellants. With him on the briefs were Black Helterline LLP and Christopher Cauble and Schultz Salisbury Cauble & Dole.

Before Haselton, Presiding Judge, and Brewer, Chief Judge,* and Rosenblum, Judge.**

BREWER, C. J.

---

* Brewer, C. J., *vice* Linder, J.

** Rosenblum, J., *vice* Ceniceros, S. J.

## BREWER, C. J.

■      This case involves the interpretation of Oregon's fill and removal law, ORS 196.800 to 196.990. In January 1999, petitioner Bridgeview Vineyards[1] asked respondent Division of State Lands (DSL) for emergency authorization to place riprap in Sucker Creek, a nonnavigable stream located in Josephine County that is designated as salmonid habitat. After DSL denied the authorization, petitioner sought judicial review of DSL's order in circuit court, alleging in its first claim for relief that its proposed activity fit within various exceptions to and exemptions from the fill and removal law's permitting requirements. The circuit court agreed and granted petitioner's motion for partial summary judgment on that claim.[2] ORCP 67 B. DSL appeals. For the reasons explained below, we reverse.[3]

As will be discussed in more detail below, the fill and removal law generally requires that a permit be obtained from DSL before removing 50 cubic yards or more of material from, or before placing a like amount of material in, waters of this state.[4] If, however, salmon spawn in the waters at issue (that is, it is "salmonid habitat"), the permit requirements are more stringent: a permit is required before *any* quantity of material may be removed or used as fill.

The fill and removal law provides exemptions from the general permitting requirements and an exception to the more stringent requirements applicable to salmonid habitat. For state waters generally, the exemptions pertain to specific activities related primarily to forestry and farming, such as

---

[1] Although Bridgeview and its president are both petitioners, we use the singular "petitioner" to refer to both.

[2] Petitioner's sixth amended petition for judicial review contained eight claims for relief; its motion for partial summary judgment pertained only to the first claim for relief. DSL also filed a motion for partial summary judgment on petitioner's remaining claims for relief. The trial court denied that motion, and DSL does not appeal from that decision.

[3] On appeal from the circuit court's review of an order in other than a contested case, we essentially review DSL's order directly, applying the standard of decision set out in ORS 183.484(5). *G.A.S.P. v. Environmental Quality Commission*, 198 Or App 182, 187-88, 108 P3d 95, *rev den*, 339 Or 230 (2005).

[4] Fifty cubic yards of material is the equivalent of about four dump truck loads.

road maintenance on farm lands and maintenance of riprap. ORS 196.905. An exception also applies to salmonid streams with more stringent permitting requirements. ORS 196.810(1)(e). But the more stringent permitting requirements for salmonid habitat also contain their own limitation. That limitation, set out in ORS 196.810(1)(b), provides that the more stringent permitting requirements do not apply to fill or removal "for activities customarily related to agriculture."

It is those permitting requirements, limitations, exceptions, and exemptions that are at issue in this case. We turn to the undisputed pertinent facts that gave rise to the controversy before us.

## I.  FACTS AND PROCEDURAL HISTORY

Sucker Creek is a salmonid stream under the fill and removal law. Petitioner's farm property lies along Sucker Creek and includes wetlands that have been converted to farm use. The property is zoned for exclusive farm use. Over the years, the property has been subject to erosion from Sucker Creek, resulting in the loss of several acres of meadows and trees as well as damage to a road that borders the creek.

In 1998, petitioner began removing gravel and rock from Sucker Creek to use as riprap along the bank to stop the erosion. That activity involved the removal of more than 50 cubic yards of material from Sucker Creek. The state halted petitioner's activity, claiming that it violated the fill and removal law, and began criminal proceedings against Kerivan, petitioner's president.

In 1999, and while the criminal proceedings were pending, petitioner sought emergency authorization from DSL to place riprap in Sucker Creek in order to shore up the stream bank.[5] Petitioner's written request referred to earlier telephone conversations and stated, in part, "The emergency permit I'm asking for would allow us *to put* rip-rap in Sucker

---

[5] ORS 196.810(4) authorizes DSL to "issue * * * an emergency authorization for the removal of material from the beds or banks or filling of any waters of this state * * * for the purpose of making repairs or for the purpose of preventing irreparable harm, injury or damage to person or property."

Creek *to extend* the rip-rap installed after the 1964 flood * * *."[6] (Emphasis added.) In denying the request, DSL indicated that it understood that petitioner's "request was to immediately place riprap along the bankline of Sucker Creek to prevent further erosion of [petitioner's] property." DSL denied petitioner's application, concluding that petitioner's concerns about erosion had been ongoing for some time and did not satisfy the criteria for issuing an emergency authorization.

Petitioner sought review of DSL's order in circuit court as an order in other than a contested case. ORS 183.484.[7] Its sixth amended petition for judicial review characterized its request for an emergency permit as one "to allow petitioners to protect their upland farmland by maintaining the Sucker Creek streambank, including streambank maintenance stabilization modifications that maintain the integrity of the existing bank." Petitioner alleged that the "proposed erosion control work included the placing of less than 50 yards of rip-rap along the banks of Sucker Creek and outside the water. The proposed work also includes removal of material from an area outside the wet perimeter and not within the adjacent nonvegetated dry gravel bar."

In its cross-motion for partial summary judgment on its first claim for relief, petitioner made two arguments in support of its assertion that DSL erred in denying its request. First, it argued that DSL incorrectly had concluded that no

---

[6] In its order granting petitioner's motion for summary judgment, the trial court stated that the activities for which petitioner sought approval in 1999 also included "maintenance and repair of the farm roads in the vineyard." Although that activity was not included in petitioner's *written* 1999 request, DSL does not contend that that activity was outside the scope of petitioner's 1999 request. Accordingly, for purposes of this opinion, we assume that it was included in the 1999 request. That assumption is most pertinent to our discussion of petitioner's argument that its proposed activities were exempt from the statutory permit requirement under ORS 196.905(4)(b).

[7] ORS 183.484(5)(a) provides, in part, that, in reviewing an order in other than a contested case,

"[t]he court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

emergency existed that justified granting the request. Second, it argued that no authorization or permit was required, because the fill and removal law did not apply to its proposed activity in any event. As to the latter argument, petitioner asserted first that its requested "erosion control" work involved an "activity customarily associated with agriculture," which was excepted under ORS 196.810(1)(b), the exception to the more stringent salmonid creek permitting provision. Second, it contended that the "activity was exempt under the provisions of ORS 196.905," which set out particular exemptions from the fill and removal permitting requirements.

During oral argument on petitioner's summary judgment motion, petitioner purported to stipulate that "we removed more than 50 cubic yards" and that "we've already agreed to more than 50 yards was [involved in] this case." There was no evidence that any such removal, or fill, for that matter, was proposed in the 1999 request. Instead, the only evidence in the record that petitioner removed or filled more than 50 cubic yards of material in Sucker Creek pertained to its 1998 activity.

After extensive briefing and argument, the circuit court granted petitioner's summary judgment motion. The court agreed with petitioner's view of the relevant statutory provisions. In its order granting the motion, the court concluded "that Petitioner's * * * proposed repair and maintenance activities in early 1999 were exempt from the removal-fill law pursuant to ORS 196.810(1)(b) and (e), or under ORS 196.905." The court set aside DSL's orders "on the ground that [DSL] erroneously intended the removal-fill law to apply to the proposed activities." The court also enjoined DSL

> "from prosecuting, assisting or seeking to prosecute Petitioners civilly, administratively or criminally for Petitioners' activities on their property that are similar to those planned in August 1998 and January 1999. These activities are the activities designed to maintain and stabilize the Southern bank of Sucker Creek to prevent further upland erosion and loss of trees and protect the road on the stream bank from being eroded. These activities also include maintenance and repair of the farm roads in the vineyard, using

natural angular rock (including gravel from gravel bars or other gravel deposits)."

The order limited petitioner's "use" to 500 cubic yards and required all work to comply with the exemptions from permitting contained in the federal Clean Water Act, 33 USC section 1344(f). The ensuing judgment that the court entered essentially reiterated the findings and remedy set forth in its order. Because it concluded that the permitting requirements did not apply to petitioner's activities, the court did not address whether DSL properly had concluded that there was no emergency.

## II. DISCUSSION

### A. *Framing the subject of appeal*

We reiterate that there is no evidence in the record indicating that, as part of its 1999 request, petitioner sought to *remove* any material from Sucker Creek. Instead, as noted, petitioner's letter to DSL requesting emergency authorization stated, in part, "The emergency permit I'm asking for would allow us *to put* rip-rap in Sucker Creek *to extend* the rip-rap installed in Sucker Creek after the 1964 flood * * *." (Emphasis added.) And, as noted, that is how DSL understood petitioner's request in denying it. Even though petitioner purported to stipulate before the trial court that "we removed more than 50 cubic yards" and that "we've already agreed to more than 50 cubic yards was [involved in] this case," the only evidence that petitioner removed or filled more than 50 cubic yards of material in Sucker Creek pertained to its 1998 activity. But, the lawfulness of that activity was not at issue in petitioner's first claim for relief and, accordingly, it was not a proper subject of consideration in connection with petitioner's motion for summary judgment.

The judgment that the court ultimately entered did not refer to the 1998 activity; it adjudicated only the validity of DSL's 1999 order. That focus was the correct one. Because it is the lawfulness of that order that we review, we do not detain ourselves with a consideration of petitioner's earlier activities.

B. *The history of Oregon's fill and removal law*

The 1967 Legislative Assembly first enacted Oregon's fill and removal law.[8] Or Laws 1967, ch 567. That enactment arose from the legislature's concern that the unregulated removal of material from state waters would adversely affect the state's ability to conserve, protect, and put the state's water resources to the best use, and would create hazards to public health, safety, and welfare. Or Laws 1967, ch 567, § 1. The legislature sought to centralize authority in DSL's director to implement control of the removal and filling of material within the beds and banks of the state's waters. *Id.* The director was required to exercise that authority, among other ways, through the granting of permits that generally were required if a person sought to remove or fill 50 cubic yards or more of material within the state's waters. *Id.* at §§ 2, 3. The law was written in a manner that barred *any* "fill" or "removal" of material, but achieved the 50 cubic yard allowance by defining the terms "fill" and "removal" as activity involving 50 cubic yards or more of material. Or Laws 1976, ch 567, § 2(5).

As originally enacted, and until 1989, the law contained no exemptions for fills or removals related to farming.[9] Thus, if a farmer wanted to place fill in or remove material from "the waters of the state" in connection with farming or ranching activities, a permit was required if the fill or removal involved 50 cubic yards or more of material.

In 1989, the legislature significantly amended the law to address concerns arising from the degradation of wetlands resources and the unregulated conversion of wetlands to agricultural uses. Or Laws 1989, ch 837. Wetlands were added to the definition of "waters of the state" that also included "all tidal and nontidal bays, constantly flowing and intermittent streams, lakes and other bodies in this state,

---

[8] Actually, as originally enacted, the fill and removal law was only a removal law. That is, it addressed only removal of material from waters of the state. It was not until 1971 that references to "fill" were added. Or Laws 1971, ch 754. Nonetheless, for ease of discussion—and because the version of the law applicable to this case addresses both fill and removal—we refer to both fill and removal throughout this opinion.

[9] In 1971, the legislature enacted an exemption related to forestry practices. Or Laws 1971, ch 754, § 12. That exemption is not involved in this case.

navigable and nonnavigable * * *." *Id.* at § 4. The result was that fill or removal of 50 cubic yards or more of material in wetlands areas—like fill or removal in other waters of the state—required a permit.

At the same time, however, and for the first time, the legislature amended the fill and removal law to allow, without a permit, fills and removals for certain activities on converted wetlands and other agricultural areas. *Id.* at § 19. Three of those statutory exemptions are relevant in this case. First, the legislature provided that the permitting requirements did not apply to certain "[n]ormal farming and ranching activities," ORS 196.905(3)(a) (1989), or "[m]inor drainage within an established farm operation as defined by rule" on converted wetlands, ORS 196.905(3)(b) (1989). Second, the legislature provided that the permitting requirements did not apply to removal or filling, or both, for "[m]aintenance of farm roads in such a manner as to not significantly adversely affect wetlands" on lands that are zoned for exclusive farm use. ORS 196.905(4)(b) (1989). Third, the legislature exempted "maintenance or reconstruction of structures such as dikes, dams, levees, groins, riprap, tidegates, drainage ditches, irrigation ditches and tile drain systems," assuming certain other requirements were met. ORS 196.905(6) (1989). Those exemptions, discussed in more detail below, were codified in ORS 196.905 (1997), before petitioner made its emergency request.

In 1993, the legislature significantly amended the fill and removal law to enhance protections for salmon spawning habitat. That amendment basically imposed for salmonid streams a requirement that *no* amount of fill or removal could occur without a permit. However, as noted above, the amendment provided an exception from this enhanced permitting requirement for "activities customarily associated with agriculture." Further, the amendment specified that the existing exemptions in ORS 196.905 also would continue to apply.

In summary, as of January 1999, the fill and removal statutes generally required a permit for the removal of 50 cubic yards or more of material from a stream or the

placement of a like amount of fill in a stream. The law, however, exempted any fill or removal that was for specifically enumerated activities occurring on converted wetlands and lands zoned for exclusive farm use, as well as any fill or removal that was for specific maintenance and reconstruction activities—*e.g.*, dikes, dams, riprap, and roads. Finally, the law also contained more stringent permitting requirements for salmonid streams by requiring a permit before any material could be removed from those streams, except for "activities customarily associated with agriculture."

C. *Application of the fill and removal law to petitioner's request*

■■    Whether petitioner was required to obtain a permit before placing fill material in Sucker Creek presents an issue of statutory interpretation. Our task, under *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993), is to ascertain the intent of the legislature, if we can, from the text and context of the statute—or, in this case, the constellation of statutes that govern fill and removal. If the legislature's intent remains unclear, we examine legislative history and, if necessary, other construction aids. *Id.* at 611-12. We proceed by first determining the reach of the permitting statute, ORS 196.810.[10]

1.    *The operation of the permitting statute, ORS 196.810*

■    ORS 196.810(1)(a) contains the basic permitting requirement under the fill and removal law. It states, simply, that, "[e]xcept as otherwise specifically permitted[,] * * * no person * * * shall remove any material from the beds or banks or fill any water of this state without a permit" issued by DSL's director. Because "fill" is defined in ORS 196.800(5) as activity involving 50 cubic yards or more of material, ORS 196.810(1)(a) requires a permit for any fill or removal activity involving 50 cubic yards or more of material.

ORS 196.810(1)(b), which was added to the law in 1993, addresses fills and removals in streams or sections of

---

[10] The 1997 versions of the statutes were in effect when petitioner sought the emergency authorization. Unless otherwise indicated, all references in this opinion are to those versions.

streams that have been designated as salmonid habitat, and provides, in part:

> "Notwithstanding the permit requirements of this section and notwithstanding the provisions of ORS 196.800(5) and (12), if any removal or fill activity is proposed in essential indigenous anadromous salmonid habitat, *except for those activities customarily associated with agriculture*, a permit is required."

(Emphasis added.)

The circuit court concluded that petitioner's proposed activity was excepted from any permit requirement under ORS 196.810(1)(b). In its letter opinion, the court reasoned that, although it seemed inconsistent with the policy underlying the fill and removal law, "a plain reading extends the [ORS 196.810(1)(b)] exception to nearly limitless bounds." On appeal, DSL argues that the circuit court interpreted the exception too broadly.

We begin by examining the text of the provision in context. The portion of ORS 196.810(1)(b) that we must construe provides first that, notwithstanding the general rule that no permit is required for fill or removal of less than 50 cubic yards of material, a permit is required for any such activity in salmonid habitat. If that were all that the provision stated, its interpretation would be straightforward. But it includes an exception for agricultural activities. The pivotal issue in this case is the scope of that exception.

■    At the first level of analysis, we do not consider the text in isolation; rather, we employ rules of textual construction that bear directly on how to read the text, and we are careful to consider the text in context. Context includes "other provisions of the same statute and other related statutes." *PGE*, 317 Or at 611. "Included in pertinent context are statements of statutory policy." *Havi Group LP v. Fyock*, 204 Or App 558, 564, 131 P3d 793 (2006).

We initially consider the textual arrangement of the exception to the more stringent permitting requirement. The general permitting requirement is set out in ORS 196.810(1)(a), while the more stringent permitting requirement is set out in paragraph (1)(b). The exception—"except

for those activities customarily associated with agriculture"—is placed in the middle of the sentence that imposes the more stringent permitting requirement. That placement alone suggests that the legislature intended for the exception to apply to the more stringent permitting requirement, but not to all permitting. But that is not the only first-level clue to the legislature's intent.

As noted, context includes legislative policy statements. Here, the legislature has stated its policy regarding fill and removal in ORS 196.805(1), which provides, in part:

"The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes, bays, estuaries and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for fish, avenues for transportation and sites for commerce and public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state for any purpose, may result in interfering with or injuring public navigation, fishery and recreational uses of the waters."

That policy statement evidences a legislative desire to protect salmon habitat and to prohibit "unregulated" fill in and removal from the waters of this state, a desire that would be inconsistent with petitioner's expansive reading of the exception for agricultural activities. As both petitioners and the circuit court recognized, petitioner's interpretation would allow virtually limitless removal of gravel from salmonid streams for agricultural activities.

The final contextual clue is found in the existence of the generally applicable exemptions from the permitting requirement that are set out in ORS 196.905—exemptions that are discussed in more detail below. ORS 196.905 shows that the legislature knows how to grant exemptions to the general permitting requirements. Those exemptions apply wholesale to the permitting requirements of the fill and removal law. It is unlikely that the legislature would enact a

broad exception to all permitting requirements in the middle of a more stringent permitting requirement.

The foregoing first-level analysis notwithstanding, we recognize that the placement of the questioned phrase in ORS 196.810(1)(b) is an example of poor grammatical sentence structure that has resulted in a difficult exercise in statutory construction. For that reason, we examine the legislative history of the 1993 amendment to ORS 196.810 from which paragraph (1)(b) originated. The parties argue at length about the meaning of that history.

Petitioner attempts to use the legislative history to support its argument that the 1993 amendment effected a complete exception from any statutory removal or fill regulation for all agricultural activities. However, nothing in the history supports that conclusion. Senator Joyce Cohen carried the bill, Senate Bill (SB) 192-2, that became ORS 196.810(1)(b). At a hearing on June 8, 1993, Senator Cohen explained that SB 192-2 originated from SB 452, which would have completely prohibited the removal of gravel from any stream that had anadromous fish, and SB 192, which would have commissioned a study on the effects of gravel removal from essential salmonid habitat. Testimony, House Committee on Natural Resources, Subcommittee on Water, SB 192, June 8, 1993, Ex B (statement of Sen Joyce Cohen).

Senator Cohen introduced SB 452 because of the experience of a constituent whose neighbor repeatedly had removed fewer than 50 cubic yards of gravel from the Nehalem River, thus evading regulatory oversight, yet adversely affecting essential salmonid habitat. Testimony, House Committee on Natural Resources, Subcommittee on Water, SB 192, June 8, 1993, Ex C (Statement of Lynne Pavur). Senator Cohen described the preexisting law as follows: "And here we have anything under 50 yards, people can go dig around all they want in any of these critical salmon habitats and with not even a request for a permit." Tape Recording, House Committee on Natural Resources, Subcommittee on Water, SB 192, June 8, 1993, Tape 114, Side A.

In the course of the 1993 legislative session, Senator Cohen combined the concepts of the two bills, in the process

reducing the scope of the proposed study in SB 192 and compromising her initial position that all gravel removal from salmonid streams should be prohibited. The compromise version, SB 192-2, proposed instead that the permit requirement for gravel removal from salmonid streams would be reduced from 50 cubic yards to zero yards. On February 19, 1993, Gary Danielson, the director of DSL, explained the effect of SB 192-2:

"First of all, the bill appears to focus, among other things, upon gravel operations that occur in state streams that involve removal of gravel from a stream of less than 50 yards. As you know, the current standard in the Removal-Fill Law requires that permits must be obtained for any removal of 50 cubic yards or greater. We have a concern and have had for some time that perhaps the removal of gravel of less than 50 cubic yards from some areas, particularly areas where there are anadromous fish, could be a concern and certainly could have detrimental impacts upon fisheries. And there has been no vehicle, at least in the statute, up to this time to deal with that."

Tape Recording, Senate Committee on Agriculture and Natural Resources, SB 192 and SB 452, Feb 19, 1993, Tape 40, Side A.

Petitioner contends that SB 192 was aimed at commercial gravel operations, but that is not correct. At the same hearing on February 19, 1993, Gary Gustafson of DSL testified that, for commercial gravel operators, "it's not going to be worth their time to remove less than 50 cubic yards from one area in one year." *Id.* Gustafson added,

"So, what we're talking about when we think about general permits for less than 50 cubic yards are probably the personal users—the folks who come up with a backhoe and take some gravel to improve their driveway or something like that. And we have a fair number of those."

*Id.*

Gustafson further testified at the June 8, 1993, hearing that, in the previous 12 months, he had received about 300 complaints about gravel removal in salmonid streams. He testified that commercial operators were not engaged in

those activities but that, "[m]ost of the activity is by misinformed or uninformed landowners." Tape Recording, House Committee on Natural Resources, Subcommittee on Water, SB 192, June 8, 1993, Tape 115, Side A. At the same hearing, Representative Dave McTeague, who had introduced another bill in the 1993 session that would have prohibited all gravel removal from salmon-bearing streams, also testified in support of SB 192-2. He stated:

> "Small-scale gravel removal from salmon-bearing streams is clearly detrimental to the recovery of some of our depressed salmon stocks and anadromous fisheries in many cases. Yet we have no statutory ability to deal with the under 50 cubic yards, which I understand is about 4 dump truck loads, so it's not an insignificant amount of gravel to take out of a critical spawning bed."

*Id.*

At the June 8 hearing, attention turned to farmers who, under SB 192-2, would have been subjected to a permit requirement for the removal of *any* gravel from a salmonid stream. A work group was established to address their concerns. On June 24, 1993, Catherine Fitch, the administrator for the House Natural Resources Committee summarized both the farmers' concerns and the solution to those concerns that the final version of the bill, SB 192-4, created:

> "There was some testimony of concern in subcommittee about how this requirement for an aggregate removal permit for under 50 yards would affect the farming community and some irrigation districts. A work group was commissioned off of this and these amendments [the -4 amendments] have been produced as a result. I'll tell you what the bill does. First of all the bill would require a permit for aggregate removal of 50 yards or less if the aggregate is to be removed from areas designated as essential salmon habitat. The amendments to the bill would exempt activities customarily associated with agriculture."

Tape Recording, House Committee on Natural Resources, SB 192, June 24, 1993, Tape 60, Side B.

In sum, the legislative history suggests that, whereas SB 192-2 would have lowered the regulatory threshold for removal and fill of material from or into salmonid

streams from 50 cubic yards to zero cubic yards, the final version, SB 192-4, was intended to except customary agricultural activities from that particular change in the law, but not from the permitting requirements altogether. We have examined the remaining legislative history that the parties have cited and are satisfied that it does not shed any further meaningful light on the legislature's intention.

For those reasons, based on our examination of the text in context and a review of the pertinent legislative history, we conclude that, under ORS 196.810, even in connection with activities customarily associated with agriculture, a permit is required to fill or remove 50 cubic yards or more of material in a salmonid stream.

With that conclusion in mind, we return to the factual record. The difficulty for petitioner is that there is no evidence with respect to the proposed volume of its 1999 fill request. Although, in its operative petition, petitioner alleged that, in that request, it had sought to fill less than 50 cubic yards of material in Sucker Creek, DSL denied that allegation in its answer to petitioner's pleadings.[11] Moreover, there was nothing in petitioner's written request that specified a particular volume, nor has petitioner pointed to any evidence in the record as to the proposed volume. Accordingly, petitioner failed to establish that its proposed activities were excepted from the permitting requirement under ORS 196.810, and it is necessary to consider its alternative argument that those activities were exempt under ORS 196.905.

2.  *The exemptions in ORS 196.905*

Were ORS 196.810(1)(a) and (b) the only provisions in play, petitioner would—as we have discussed—need a permit to perform its proposed in-stream work. But ORS 196.810(1)(e) provides that, "[n]othing in this section limits

---

[11] Petitioner also filed a request for admissions in the trial court. That request included 79 items, none of which addressed the volume of fill that petitioner proposed to place in Sucker Creek pursuant to its 1999 request. And, as discussed, although, at a hearing on their cross-motions for summary judgment, the parties apparently reached a stipulation as to the volume of material that petitioner previously had *removed* from Sucker Creek, that stipulation did not pertain to petitioner's 1999 request, the denial of which is the subject of petitioner's first claim for relief.

or otherwise changes the exemptions under ORS 196.905." Before the circuit court, petitioner argued that the exemptions in ORS 196.905(3), (4), and (6) applied to its proposed activity. As noted above, the circuit court concluded that petitioner's "repair and maintenance activity is exempt from any permit pursuant to ORS 196.810(1)(b) and (e); and pursuant to ORS 196.905 * * *." On appeal, DSL argues that none of the three exemptions on which petitioner relies applies. We now consider each of those exemptions.

ORS 196.905 provides, in part:

"(3) Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the following activities on converted wetlands:

"(a) Normal farming and ranching activities such as plowing, grazing, seeding, cultivating, conventional crop rotation, harvesting for the production of food and fiber, upland soil and water conservation practices or reestablishment of crops under federal conservation reserve program provisions; or

"(b) Minor drainage within an established farm operation as defined by rule.

"(4) Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the following activities on exclusive farm use zoned lands:

"(a) Drainage or maintenance of farm or stock ponds; and

"(b) Maintenance of farm roads in such a manner as to not significantly adversely affect wetlands.

"* * * * *

"(6) Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the maintenance or reconstruction of structures such as dikes, dams, levees, groins, riprap, tidegates, drainage ditches, irrigation ditches and tile drain systems, provided that:

"(a) The structure was serviceable within the past five years; and

"(b) Such maintenance or reconstruction would not significantly adversely affect wetlands that existed at the

time that the structure was in good repair other than those wetlands that were significantly adversely affected as a result of the original construction of those structures."

Each of those subsections has a similar structure. Each subsection provides that "[n]othing in [the fill and removal law] applies to removal or filling or both, for [specified activities]." Paragraph (3)(a) exempted any fill or removal that was for normal farming and ranching activities or minor drainage "on converted wetlands." Paragraph (4)(b) exempted any fill or removal that is for maintenance of farm roads "on lands zoned exclusive farm use." Subsection (6) exempted any fill or removal that was for the maintenance of structures such as riprap. Unlike subsections (3) and (4), subsection (6) did not require that the work be done on converted wetlands or property zoned for exclusive farm use.

Petitioner argues that the plain text of the exemptions in ORS 196.905 authorized its proposed operation because it involved activities listed in the exemptions.[12] In response, DSL primarily argues that the circuit court incorrectly concluded that the exemptions, "which allow the removal or fill of material for specific types of activities at specific locations," also authorize the fill or removal of gravel or other material in "any waterway *located elsewhere*."[13] (Emphasis in original.)

■■ Although the parties do not describe their disagreement in these terms, we view that disagreement, as it pertains to subsections (3) and (4), as one involving the application of the doctrine of the last antecedent. *See State v. Webb*, 324 Or 380, 386, 927 P2d 79 (1996) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is the last word, phrase, or clause that can be made an

---

[12] Petitioner includes the exemption in ORS 196.905(8) in its argument addressing ORS 196.905(6). We do not address ORS 196.905(8) separately because it does not appear that petitioner relied on that exemption below.

[13] The second aspect of DSL's intertwined argument rests on its assertion that, although petitioner's vineyard may be zoned for exclusive farm use and may consist of converted wetlands, Sucker Creek fits neither of those descriptions. It follows, according to DSL, that, even if gravel filled in or removed from Sucker Creek is used at another location in an operation that fits within one of the exemptions, the activity in Sucker Creek does not fit within an exemption.

antecedent without impairing the meaning of the sentence. * * * Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." (internal quotation marks omitted)). However, the doctrine is only a textual aid, and its application yields to more persuasive contextual evidence of the legislature's intent and to common sense. *State v. Johnson*, 339 Or 69, 93-94, 116 P3d 879 (2005) (declining to apply doctrine where it would render a statute's meaning implausible "in the context of [Supreme Court] case law and the general assumption that statutes are rational").

Stated in terms of the possible choices under the last antecedent doctrine, the preface to subsection (3) could be read in one of three ways. First, as petitioner would have it, the qualifying phrase "on converted wetlands" could modify only the immediately preceding phrase, "for the following activities." Because "on converted wetlands" would not also modify "removal or filling, or both," that reading would support petitioner's premise that the activities exempted by subsection (3) can occur at a different place from the corresponding fill and removal work pertaining to them. If that is the correct reading, the fact that a proposed "normal farming activity" would occur on converted wetlands would be sufficient to trigger the exemption, even though the proposed filling to serve that activity might occur elsewhere, in this circumstance, in a salmonid stream. The grammatical structure of subsection (3) lends some support to petitioner's premise, because the qualifying phrase is not separated from the antecedents by a comma. *Webb*, 324 Or at 386.

The second possibility is that the qualifying phrase "on converted wetlands" modifies both the immediately preceding phrase, "for the following activities," and, in addition, the more remote phrase "removal or filling, or both." If read in that way, the preface to subsection (3) would, in effect, provide that "[n]othing in ORS 196.800 to 196.900 applies to removal or filling, or both [on converted wetlands], for the following activities on converted wetlands[.]" If that reading is the correct one, subsection (3) would be inapplicable in this case. That would be so because Sucker Creek—the location of

the proposed filling—in contrast to other portions of petitioner's property, is not converted wetland on which petitioner conducted "normal farming" activities. *See* ORS 196.905(8)(a) ("converted wetland" means "wetlands that on or before June 30, 1989, have been diked, drained, dredged, filled, leveled or otherwise manipulated to impair or reduce the flow, circulation or reach of water for the purpose of enabling production of an agricultural commodity and are managed for that purpose[.]").

The third possibility is that, despite its placement at the end of the preface to subsection (3), the phrase "on converted wetlands" modifies only the more distant antecedent phrase "removal or filling, or both," and not the last antecedent phrase, "for the following activities." Read in that way, the preface to subsection (3) would, in effect, provide, "Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both [on converted wetlands], for the following activities * * *." If that is the correct reading, the focus of the exemption would be on the converted wetland status of the location of the proposed removal or filling, and the status of the location of the proposed qualifying activity—in this case, normal farming activity—would be inconsequential.

The difficulty with the first possible reading is that, if the phrase "on converted wetlands" modified only "for the following activities," rather than, in addition, or alternatively, "removal or filling, or both," petitioner would be free, without securing a permit, to fill or excavate *any waters of the state* in the service of qualifying farming activity on converted wetlands. Such an expansive reading of the statute would violate the stated purpose of the fill and removal law. Again, the policy underlying the statutory scheme is that

> "[t]he protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes, bays, estuaries and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for fish, avenues for transportation and sites for commerce and public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health,

> safety and welfare of the people of this state. Unregulated filling in the waters of this state for any purpose, may result in interfering with or injuring public navigation, fishery and recreational uses of the waters."

ORS 196.805(1). As discussed, that statement strongly evidences a legislative policy to protect salmon habitat and to prohibit the "unregulated" fill in and removal of materials from the waters of this state, a policy that is directly at odds with petitioner's reading of subsection (3). Petitioner's reading would authorize virtually limitless removal for farming activities of gravel from salmonid streams. It is illogical, in light of its stated policy, to believe that, in enacting subsection (3), the legislature would be concerned with the converted wetland status of the location at which proposed farming activity would occur but would be unconcerned with the status of the location of the proposed removal or filling activity. The last antecedent doctrine yields to countervailing context and common sense in such circumstances. *See Johnson*, 339 Or at 93-94 (relying on "rationality" and "longstanding interpretation"). Accordingly, we reject petitioner's reading of subsection (3).

For two reasons, we conclude that the second possible reading of subsection (3) is the correct one. First, the second possible reading is the more grammatically plausible of the remaining possibilities, because, unlike the third reading, it would not exclude the qualifying phrase "on converted wetlands" from modifying the last antecedent, "for the following activities," in addition to the more remote antecedent, "removal or filling, or both." It would strain credulity to conceive that the legislature would so inaptly place the qualifying phrase in relation to at least one applicable antecedent. Second, and what is more important, it appears that the legislature's focus in subsection (3) was a narrow one, that is, on fill and removal activities on converted wetland that had been dedicated to specifically approved purposes. Only the second reading would require the colocation of the proposed removal or filling activity with the proposed activity that the removal or filling would serve. Again, it would be inconsistent with the express policy underlying the statutory framework to construe subsection (3), as the third possible reading would require, so as to allow the unregulated fill or removal

of converted wetlands for the benefit of normal farming activities, unless those activities also occurred on the same converted wetland. Accordingly, we conclude that the second reading is the correct one. It follows that, because Sucker Creek—in contrast to other portions of petitioner's property—is not converted wetland on which petitioner conducted "normal farming" activities, subsection (3) is inapplicable.

■    The resolution of the parties' dispute concerning subsection (4) involves similar considerations. Petitioner asserts that its proposed 1999 activity was exempt under paragraph (4)(b), because it intended to deposit riprap in Sucker Creek to maintain its vineyard road by preventing it from being "undermined and washed out." As noted, ORS 196.905(4) provided:

> "Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the following activities on exclusive farm use zoned lands:
>
> "(a)    Drainage or maintenance of farm or stock ponds; and
>
> "(b)    Maintenance of farm roads in such a manner as to not significantly adversely affect wetlands."

Again, stated in terms of the possible choices under the last antecedent doctrine, the preface to subsection (4) could be read in one of three ways. First, as petitioner would have it, the qualifying phrase "on exclusive farm use zoned lands" could modify only the immediately preceding phrase, "for the following activities." Because "on exclusive farm use zoned lands" would not also modify "removal or filling, or both," that reading would support petitioner's premise that the activities exempted by subsection (4) can occur at a different place from the corresponding fill and removal work pertaining to them. If that is the correct reading, the fact that the proposed "maintenance of farm roads" would occur on exclusive farm use zoned lands would be sufficient to trigger the exemption, even though the proposed filling might occur, as in this case, in a salmonid stream.[14] Again, the grammatical structure of subsection (4) lends some support to petitioner's premise, because the qualifying phrase is not separated from the antecedents by a comma. *Webb*, 324 Or at 386.

---

[14] We note, but do not resolve, the parties' dispute about whether waters of the state such as Sucker Creek, or at least the land underlying them, can be deemed to constitute "exclusive farm use zoned lands." The parties have not adequately

The second possibility is that the qualifying phrase "on exclusive farm use zoned lands" modifies both the immediately preceding phrase, "for the following activities," and, in addition, the more remote phrase "removal or filling, or both." If read in that way, the prefatory sentence would, in effect, provide, "Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both [on exclusive farm use zoned lands], for the following activities on exclusive farm use zoned lands." If that reading is the correct one, subsection (4) would not assist petitioner in this case. That would be so because Sucker Creek—the location of the proposed filling— is not the exclusive farm use zoned land on which the qualifying activity, farm road maintenance, is proposed to occur.

Again, the third possibility is that, despite its placement at the end of the preface to subsection (4), the phrase "on exclusive farm use zoned lands" modifies only the more distant antecedent phrase "removal or filling, or both," and not the last antecedent phrase, "for the following activities." Read in that way, the preface to subsection (4) would, in effect, provide, "Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both [on exclusive farm use zoned lands], for the following activities * * *." If that is the correct reading, the focus of the exemption would be on the exclusive farm use zoning status of the location of the proposed removal or filling, and the status of the location of the proposed qualifying activity—in this case, farm road maintenance—would be inconsequential.

As was the circumstance with subsection (3), the grammatical structure of subsection (4) lends support to the first possible reading and, derivatively, to petitioner's premise that the removal or filling of material in service of the maintenance of a farm road can occur at a different site from the road itself. However, by force of the same analysis undertaken with respect to subsection (3), we conclude that the phrase "on exclusive farm use zoned lands" in subsection (4) refers to the same site both for purposes of the proposed filling or removal and the activity that is thereby served.

---

briefed the issue and, in view of our construction of subsection (4), it is not necessary to address it.

Again, it would be inconsistent with the express policy under-lying the statutory framework to construe subsection (4), as the first and third possible readings would require, so as to allow the unregulated fill or removal of waters of the state for the benefit of farm road maintenance, unless both activities occurred at the same site.[15] Otherwise, subsection (4) could authorize, for example, the unregulated excavation or filling of a stream for the purpose of maintaining a farm road located miles away on property held under different ownership.

The context of paragraph (4)(b) also supports that construction. Paragraph (4)(a) authorized the unregulated filling and removal for "drainage or maintenance of farm or stock ponds" on exclusive farm use zoned lands. Logically, the filling or removal of material associated with such an activity occurs on-site with the activity itself.

As was the circumstance with subsection (3), only the second possible reading of subsection (4) would require the colocation of an unregulated removal or filling operation with the qualifying activity that the removal or filling would serve. Accordingly, we reject the first and third possible read-ings of subsection (4) and conclude that the legislature intended the second reading. It follows that, because Sucker Creek is not the same site as petitioner's roads, subsection (4) did not authorize the unregulated filling of Sucker Creek that petitioner proposes to undertake.

The exemption in ORS 196.905(6) presents yet a dif-ferent issue. Again, subsection (6) provided:

"Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the maintenance or reconstruction of structures such as dikes, dams, levees, groins, riprap, tide-gates, drainage ditches, irrigation ditches and tile drain systems, provided that:

"(a) The structure was serviceable within the past five years; and

---

[15] Such colocation can occur. In fact, that circumstance existed in the only pre-vious appellate decision to date involving the construction of subsection (4). *See Owen v. Division of State Lands*, 189 Or App 466, 76 P3d 158 (2003) (involving the maintenance or reconstruction of a road that spanned wetlands).

"(b) Such maintenance or reconstruction would not significantly adversely affect wetlands that existed at the time that the structure was in good repair other than those wetlands that were significantly adversely affected as a result of the original construction of those structures."

Unlike the other exemptions on which petitioner relies, subsection (6) was not limited to activities on converted wetland or exclusive farm use zoned lands. Instead, it focused on the maintenance or reconstruction of particular categories of structures, regardless of their location; the thread that unifies those categories, however, is that they each pertained to structures that affect the flow or course of waters.

In this case, petitioner asserts that subsection (6) authorized it, without regulation, "to put rip-rap in Sucker Creek to extend the rip rap installed after the 1964 flood * * *." Subsection (6) provided that no permit was required for removal or filling for the maintenance or reconstruction of certain structures, including riprap, if two conditions were met. First, the maintenance or reconstruction had to be on a structure that was serviceable within the past five years.[16] Second, the maintenance or reconstruction could not "significantly adversely affect wetlands that existed at the time that the structure was in good repair other than those wetlands that were significantly adversely affected as a result of the original construction of those structures." *Id.*

DSL argues that the trial court erred in concluding that petitioner's proposed activities were exempt under subsection (6). It asserts that subsection (6) "allows anyone to fill or remove material for the maintenance of existing such structures, if the structure was serviceable in the past five years and the action would not harm Oregon waters." DSL also argues that the exemption "does not grant a farmer authority to quarry gravel from the bed and banks of any waterway in order to maintain a structure in a different location." Petitioner replies that subsection (6) is applicable because its "farm roads, riprap, diking, vineyard and drainages were existing serviceable structures. There is no issue that these structures were being damaged by erosion * * *.

---

[16] That requirement is not at issue in this case.

DSL's sole contention here is the source of material to conduct the repair." In petitioner's view, Sucker Creek was a permissible source of fill or removal for its structures because the statute did not condition or restrict the sources of such material.[17]

We understand the parties' disagreement about the meaning of subsection (6) to reprise, in part, their differences about the meaning of subsections (3) and (4). That is, the parties focus to a significant extent on whether subsection (6) required that any unregulated removal or fill must occur at the same location as the qualifying maintenance or reconstruction activity. However, as we now explain, that dimension of their disagreement is not dispositive.

Because the structure of subsection (6) is materially different from the structures of subsections (3) and (4), its construction does not involve the application of the last antecedent doctrine. That is, there is no qualifying phrase in the preface to subsection (6) that could, depending on how the entire preface is read, modify one or more of multiple possible antecedents. In fact, unlike in subsections (3) and (4), nothing in the text of subsection (6) suggests that the legislature necessarily was concerned, in enacting it, with whether any proposed fill or removal would occur at the same location as the maintenance or reconstruction that it would facilitate. Instead, the legislature imposed a condition on the exemption, found in paragraph (6)(b), that focused on the effect of the proposed maintenance or reconstruction on wetlands. That paragraph authorized removal or filling for the maintenance or reconstruction of qualifying structures only where to do so would not "significantly adversely affect wetlands that existed at the time that the structure was in good repair other than those wetlands that were significantly adversely

---

[17] Petitioner relies heavily on this court's decision in *Owen*. Although *Owen* involved the construction of ORS 196.905, it addressed a different issue: the distinction between "maintenance" and "reconstruction" under ORS 196.905(4). *Owen* did not involve a salmonid stream or the construction of ORS 196.810(1)(b). Moreover, this case, by contrast to *Owen*, does not implicate the distinction between the maintenance and reconstruction of structures on or in state waters. Simply stated, *Owen* does not inform the analysis in this case.

affected as a result of the original construction of those structures." ORS 196.905(6)(b). Again, because the focus of paragraph (6)(b) was on effects, not location, affected waters could be located at the site of the proposed maintenance or, alternatively, they could be located elsewhere.

■ Petitioner's understanding of the exemption founders on paragraph (6)(b). As the proponent of an exemption under subsection (6), petitioner was required to demonstrate that it had satisfied the requirements of that subsection, including those in paragraph (6)(b). Because there is no evidence in the record showing that the proposed maintenance of petitioner's riprap would not "significantly adversely affect wetlands that existed at the time that the [riprap] was in good repair other than those wetlands that were significantly adversely affected as a result of the original construction of [the riprap]," petitioner did not establish that the proposed maintenance was exempt under subsection (6).[18]

To summarize, the specific exception in ORS 196.810(1)(b) did not excuse petitioner from obtaining a fill permit, because there is no evidence that its proposal involved less than 50 cubic yards of fill. Nor did petitioner demonstrate that any of the exemptions in ORS 196.905 apply. It follows that the trial court erred in granting petitioner's motion for partial summary judgment on its first claim for relief.

### III.   THE CROSS-APPEAL

Petitioner filed a cross-appeal in which it challenges the trial court's order and judgment denying its request for

---

[18] As noted, the parties' arguments primarily focus on whether subsection (6) requires that any unregulated removal or fill must occur at the same location as the qualifying maintenance or reconstruction activity. Although we have concluded that that is not the dispositive issue, we must, when presented with a problem of statutory construction, correctly interpret the statute, regardless of the parties' proposed interpretations. *See Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) ("In construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties."). Because this case requires us to decide whether subsection (6) applies to petitioner's claim, "we consider the statute to determine whether it applies." *J. R. Simplot Co. v. Dept. of Agriculture*, 340 Or 188, 194, 131 P3d 162 (2006) (applying *Stull*); *see also State v. Walker*, 192 Or App 535, 542, 86 P3d 690, *rev den*, 337 Or 327 (2004) (where party "plainly put in issue the proper construction of the statute," appellate court has obligation to correctly construe it, regardless of the parties' arguments).

attorney fees under ORS 183.497. Because we reverse the trial court's judgment on the merits, petitioner is not entitled to attorney fees in any event. Accordingly, we affirm on cross-appeal without further discussion.

On appeal, reversed and remanded; affirmed on cross-appeal.