Argued and submitted January 20, affirmed August 5, 2009

Lenhart (Bud) GIENGER
and Gienger Farms, Inc.,
*Petitioners,*

*v.*

DEPARTMENT OF STATE LANDS,
*Respondent.*

Department of State Lands
114983; A131298

214 P3d 75

Clarence H. Greenwood argued the cause and filed the briefs for petitioners. With him on the briefs was Black Helterline LLP.

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Petitioner[1] seeks judicial review of a final order of the Department of State Lands (the department) that found that petitioner had violated ORS 196.810 by removing material from the bed and banks of a waterway known as Golf Course Creek without a permit. On review, he raises five assignments of error to the department's final order. We conclude that the department correctly determined that Golf Course Creek is a "water of the state" and not exempt from the requirements of ORS 196.810. Consequently, we affirm.

Although there are some purported factual issues raised by petitioner in this case, the following facts were found by the administrative law judge (ALJ) and the department and are undisputed. Petitioner is a dairy farmer and owns a farm in Tillamook County. This case arose as a result of petitioner's removal of more than 50 cubic yards of material from Golf Course Creek without a permit. The portion of Golf Course Creek at issue in this proceeding runs through land that is part of petitioner's dairy farm. Petitioner uses the fields on that part of the farm to grow rye grass to feed to his dairy cows. The rye grass fields have an underground tile drainage system that drains into Golf Course Creek.

Golf Course Creek began as a natural waterway, but parts of it have been channelized and relocated over the past 150 years. When petitioner purchased the land over which the relevant portion of Golf Course Creek runs, the creek drained into the Wilson River through a four-foot culvert and a tide gate. The culvert ran under Boquist Road at a point just north of the Wilson River. Sometime after purchasing his land, petitioner constructed a drainage ditch connecting Golf Course Creek with the Wilson River by way of a two-foot culvert under Boquist Road. After construction of the drainage ditch, the western part of the creek drained into the Wilson River through the older, larger culvert only in the winter when there was excess water in the creek.

---

[1] Both Lenhart Gienger and Gienger Farms, Inc., are petitioners in this case. Because he is the individual involved in this proceeding and owns the property at issue, throughout this opinion we refer to Gienger as petitioner.

The Tillamook County Creamery is adjacent to the portion of petitioner's farm at issue in this case. Late in 2003, the creamery began to discharge its effluent water into a marsh near the north end of Golf Course Creek. That additional water raised the level of the creek two and one-half feet and caused water to back up onto petitioner's farm fields. At the same time, the west end of Golf Course Creek was overgrown with reeds and canary grass, and the four-foot culvert was partially clogged with dirt and debris.

In January 2004, petitioner used a trackhoe to remove more than 50 cubic yards of material, including dirt and canary grass, from the west end of Golf Course Creek. As the result of a complaint to the Department of Fish and Wildlife, officers conducted an investigation and observed evidence of what appeared to be several hundred cubic yards of material removed from the banks of Golf Course Creek. That was later confirmed when an official from the department inspected the excavation site.

The department issued a cease and desist order dated January 23, 2004, and that order was served on petitioner the same day. Thereafter, the department issued a proposed order fining petitioner for the unpermitted removal of material from the creek. A contested case hearing was held in December 2004, and the ALJ later issued a proposed order that included findings of fact and conclusions of law. The ALJ concluded that, although Golf Course Creek was a "water of the state" pursuant to ORS 196.810,[2] it was exempt from the

---

[2] ORS 196.810 provides, in part:

"(1)(a) Except as otherwise specifically permitted under ORS 196.600 to 196.905, a person may not remove any material from the beds or banks of any waters of this state or fill any waters of this state without a permit issued under authority of the Director of the Department of State Lands, or in a manner contrary to the conditions set out in the permit, or in a manner contrary to the conditions set out in an order approving a wetland conservation plan."

Furthermore, ORS 196.800(14) provides:

" 'Waters of this state' means all natural waterways, tidal and nontidal bays, intermittent streams, constantly flowing streams, lakes, wetlands, that portion of the Pacific Ocean that is in the boundaries of this state, all other navigable and nonnavigable bodies of water in this state and those portions of the ocean shore, as defined in ORS 390.605, where removal or fill activities are regulated under a state-assumed permit program as provided in 33 U.S.C. 1344(g) of the Federal Water Pollution Control Act, as amended."

permit requirement of that statute pursuant to ORS 196.905(3), (4), and (6).[3] The department submitted exceptions to the proposed order, and the ALJ submitted a response to those exceptions. Ultimately, the department issued a final order wherein it adopted the ALJ's findings of fact, added one historical fact that had not been included in the proposed order, and concluded that, legally, none of the exemptions from the permit requirement discussed in the ALJ's proposed order applied. Petitioner then sought judicial review before this court.

As noted, in the final order, the agency included an additional finding of fact that the ALJ had not included in the proposed order. The final order explained the reason for that addition:

"In her finding of fact number 5, the ALJ found certain facts concerning the nature of Golf Course Creek. However, that

---

[3] ORS 196.905 provides, in part:

"(3) Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, on converted wetlands for normal farming and ranching activities such as plowing, grazing, seeding, cultivating, conventional crop rotation, harvesting for the production of feed and fiber, upland soil and water conservation practices or reestablishment of crops under federal conservation reserve program provisions.

"(4) Nothing in ORS 196.800 to 196.900 applies to the removal or filling, or both, for the following activities on exclusive farm use zoned lands:

"(a) Drainage or maintenance of farm or stock ponds;

"(b) Maintenance of farm roads in such a manner as to not significantly adversely affect wetlands;

"(c) Subsurface drainage, by deep ripping, tiling or moling, on converted wetlands; and

"(d) Any activity described as a farm use in ORS 215.203 that is conducted on prior converted cropland as described in subsection (8) of this section, so long as agricultural management of the land has not been abandoned for five or more years.

"* * * * *

"(6) Nothing in ORS 196.800 to 196.900 applies to removal or filling, or both, for the maintenance or reconstruction of structures such as dikes, dams, levees, groins, riprap, tidegates, drainage ditches, irrigation ditches and tile drain systems, provided that:

"(a) The structure was serviceable within the past five years; and

"(b) Such maintenance or reconstruction would not significantly adversely affect wetlands or other waters of this state to a greater extent than the wetlands or waters of this state were affected as a result of the original construction of those structures."

finding is incomplete, in that it does not address the significance of the facts that Golf Course Creek originates in the headwaters and flows into the Wilson River. [The final order's additional factual finding] states a fact that can reasonably be inferred from the ALJ's findings and which addresses the significance of the facts noted above. [The final order also includes an additional] corresponding conclusion of law about the nature of Golf Course Creek. That legal conclusion notes that Golf Course Creek is not a 'drainage ditch.' "

The additional factual finding included in the final order is that

"[a]lthough the western portion of Golf Course Creek, particularly that portion situated west of Highway 101, has been channelized and relocated over the last 150 years, its essential character as a natural waterway has persisted, in that this stream has headwaters starting in the foothills and carries a natural flow into the Wilson River."

As part of his first assignment of error, petitioner contends that the agency's addition of that factual finding to the final order improperly "contradicts the findings made by the ALJ[.]"[4] (Emphasis omitted.)

■　　ORS 183.650 provides, in part:

"(3)　An agency conducting a contested case hearing may modify a finding of historical fact made by the administrative law judge assigned from the Office of Administrative Hearings only if the agency determines that the finding of historical fact made by the administrative law judge is not supported by a preponderance of the evidence in the record. For the purposes of this section, an administrative law judge makes a finding of historical fact if the administrative law judge determines that an event did or did not occur in the past or that a circumstance or status did or did not exist either before the hearing or at the time of the hearing.

---

[4] Petitioner also contends that the final order fails to properly defer to or acknowledge additional factual findings that it states were made by the ALJ in her response to the department's exceptions to the proposed order. Petitioner is incorrect. Contrary to his assertion, the response contains no additional factual findings. It merely discusses the department's assertions in the exceptions to the proposed order and explains why the ALJ believed those arguments to be incorrect.

> "(4)  If a party seeks judicial review of an agency's modification of a finding of historical fact under subsection (3) of this section, the court shall make an independent finding of the fact in dispute by conducting a review de novo of the record viewed as a whole. If the court decides that the agency erred in modifying the finding of historical fact made by the administrative law judge, the court shall remand the matter to the agency for entry of an order consistent with the court's judgment."

"Any petitioner who asks this court to engage in *de novo* review pursuant to ORS 183.650(4) *must specifically* identify *each* challenged modification of a finding of historical fact and *explain* why that modification was erroneous as unsupported by a preponderance of the evidence." *Corcoran v. Board of Nursing,* 197 Or App 517, 526, 107 P3d 627 (2005) (emphasis in original).

■        Even assuming, without deciding, that the agency's additional factual finding in the final order was a modification within the scope of ORS 183.650, on *de novo* review, we conclude that it is supported by a preponderance of evidence in the record. Specifically, Chris Knutsen of the Department of Fish and Wildlife testified that Golf Course Creek runs out of the foothills. In addition, Russ Klassen of the Department of State Lands testified that the creek comes from the head waters in the mountains. Maps introduced into evidence confirm this, depicting Golf Course Creek as originating in the hills and connecting to the Wilson River. In light of all the evidence in the record, we conclude that the factual finding added to the final order by the agency—that Golf Course Creek has retained its character as a natural waterway beginning in the foothills and flowing to the Wilson River—is supported by a preponderance of the evidence.

■        Petitioner also contends, as part of his first assignment of error, that the agency improperly rejected and modified the ALJ's factual findings when it concluded that Golf Course Creek was not a drainage ditch. However, the question of whether Golf Course Creek was a drainage ditch under ORS 196.905(6) and the administrative rules is a legal

issue and any modification of the proposed order's conclusions on that issue was not a modification of the ALJ's findings of historical fact.[5] *See* ORS 183.650(3). Accordingly, we review the agency's conclusions regarding that legal issue for errors of law. ORS 183.482(8); *see also Moon v. Government Standards and Practices Comm.*, 198 Or App 244, 246, 246 n 1, 108 P3d 112 (2005) (where an assignment of error involves a conclusion of law, not a finding of fact, ORS 183.650(4) is not applicable and the court reviews for errors of law).

Along with the assertion in his first assignment of error that Golf Course Creek is a drainage ditch, petitioner contends in his second and third assignments of error that the department's final order is contrary to ORS 195.905(6) exempting structures such as drainage ditches from permit requirements and the department's handbook and regulations relating to drainage ditches. The resolution of those assignments of error turns on whether Golf Course Creek, as it crosses petitioner's farm and in the location from which he removed material, can properly be considered a drainage ditch pursuant to ORS 196.905(6) and the agency's regulations.

As set forth above, pursuant to ORS 196.905(6), under appropriate circumstances the permit requirement contained in ORS 196.810 does not apply "to removal or filling, or both, for the maintenance or reconstruction of structures such as dikes, dams, levees, groins, riprap, tidegates, drainage ditches, irrigation ditches and tile drain systems[.]" The plain meaning of the term "structure," as used in the text of the statute, is "something constructed or built[.]" *Webster's Third New Int'l Dictionary* 2267 (unabridged ed 2002). The administrative regulations define the term "structure" consistently with that plain meaning as "an object, device (e.g., piling, culvert), excavation or alteration (e.g., irrigation ditch or push-up dam) that is constructed, installed or erected, and

---

[5] To the extent petitioner argues that the agency's modification of the ALJ's legal conclusions on that issue was not explained, we note that the final order stated that it "corrected certain errors [that] the ALJ made in interpreting the Removal-Fill Law and [the department's] rules." It also included a lengthy legal analysis relating to that issue.

is designed to accomplish a specific purpose. Structures require a location in waters of the state (e.g., irrigation or drainage ditch)." OAR 141-085-0010(200) (July 10, 2003).[6]

Thus, pursuant to the plain meaning of the statute taken together with the definition of "structure" in the administrative rule, to fall within the scope of ORS 196.905(6), a waterway would need to be something constructed or built and designed to accomplish a specific purpose. Furthermore, OAR 141-085-0010(53) (July 10, 2003), provides that " '[d]rainage ditch' means channels excavated from the surface of the ground designed to remove surface or shallow ground water." On the other hand, the term "natural waterways," as used in ORS 196.800(14) (defining "waters of this state"), is defined in the regulations as

> "waterways created naturally by geological and hydrological processes, waterways that would be natural but for human-caused disturbances (e.g. channelized or culverted streams, impounded waters, partially drained wetlands or ponds created in wetlands) and that otherwise meet the definition of waters of the state * * *."

OAR 141-085-0010(139) (July 10, 2003). Thus, the administrative agency's regulations confirm that, to be a drainage ditch as opposed to a natural waterway, the creek would need to have been excavated and designed to remove water rather than being naturally created. Under those definitions, even a channelized stream is a natural waterway as opposed to a drainage ditch.

As discussed above, Golf Course Creek is not manmade. Rather, it is a naturally occurring waterway that originates in the hills and flows to the Wilson River. Underground tiling in the surrounding fields drains into the creek, removing water from the farmland, but that does not convert the stream into a drainage ditch. Although Golf Course Creek has been channelized and its course has been modified over the years, it nonetheless maintains its essential character as a natural stream. As a natural stream as opposed to a

---

[6] Petitioner's removal of material from Golf Course Creek occurred in 2004 and, for that reason, we refer to the administrative regulations that were in effect at that time.

man-made structure, it does not fall within the exemption provided by ORS 196.905(6).

That conclusion is consistent with the agency's interpretation of its own regulatory definition of the term "drainage ditch." In its final order, the department recounted the regulatory definition of the terms "structure" and "drainage ditch." It then interpreted those regulations in the course of applying them to this case: "As is clear from the[ ] definitions, a 'drainage ditch' is not a 'natural waterway,' but rather a human-created structure attached to or connected with a 'water of the state.'" Because Golf Course Creek was naturally created, the department concluded that it could not be a structure or a drainage ditch.

■■ Generally, we give deference to an agency's plausible interpretation of its own rules:

> "An agency may determine whether the standard established in a rule has been met in a particular instance by interpreting the rule in the course of applying it. We defer to the agency's plausible interpretation of its own rule, including an interpretation made in the course of applying the rule, if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law."

*DeLeon, Inc. v. DHS*, 220 Or App 542, 548, 188 P3d 354 (2008) (citations omitted); *see Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). Here, the agency's interpretation and application of its rules is plausible and consistent with the wording of its rules and the provisions of ORS 196.905(6). It is also consistent with our conclusion, set forth above, that, because it is a naturally created channelized stream, Golf Course Creek does not fall within the scope of ORS 196.905(6). For all of those reasons, we conclude that petitioner's first three assignments of error are not well taken.

■ In his last two assignments of error, petitioner contends that the department wrongly concluded that neither ORS 196.905(3) nor ORS 196.905(4) applied to his removal of material from Golf Course Creek. As to the exemptions from the permitting requirement provided by each of those sections, the department stated in its final order that they were inapplicable because a stream is not converted wetland

within the purview of ORS 196.905(3) or prior converted cropland covered by ORS 196.905(4). We agree with the department.

Pursuant to ORS 196.905(3), the permit requirement of ORS 196.810 does not apply "to removal or filling, or both, on converted wetlands for normal farming and ranching activities such as plowing, grazing, seeking, cultivating, conventional crop rotation, harvesting for the production of food and fiber, upland soil and water conservation practices or reestablishment of crops under federal conservation reserve program provisions." ORS 196.905(8) defines the term "converted wetland":

"For purposes of this section, 'converted wetland':

"(a)   Means wetlands that on or before June 30, 1989, have been diked, drained, dredged, filled, leveled or otherwise manipulated to impair or reduce the flow, circulation, or reach of the water for the purpose of enabling production of an agricultural commodity and are managed for that purpose; and

"(b)   Includes land that the Natural Resources Conservation Service of the United States Department of Agriculture, or its successor agency, certifies as prior converted cropland or farmed wetlands, so long as agricultural management of the land has not been abandoned for five or more years."

Here, it is undisputed that petitioner's farmland, on which the stream is located, qualifies as "converted wetland" under the statutory definition. However, the facts of this case make clear that petitioner's activity did not take place "on converted wetlands." Instead, he removed material from the banks of Golf Course Creek. The exemption for normal farming and ranching activities on converted wetlands does not extend to the work petitioner conducted on the banks of the stream itself. *See Bridgeview Vineyards, Inc. v. State Land Board*, 211 Or App 251, 268-73, 154 P3d 734, *rev den*, 343 Or 690 (2007) (explaining how the ORS 196.905(3) exemption applies to activities on converted wetlands and concluding that the creek at issue was not a converted wetland on which normal farming activities were conducted).

For the same reason, the exemptions outlined in ORS 196.905(4) relating to certain activities on prior converted cropland and converted wetlands are inapplicable here. Similar to the exemption in ORS 196.905(3), those exemptions apply to qualified activities "on converted wetlands" and "on prior converted cropland[,]" not to activity conducted within a stream. *See Bridgeview Vineyards, Inc.*, 211 Or App at 273-75. Accordingly, we conclude that the department did not err in determining that the exemptions contained in ORS 196.905(3) and (4) did not cover petitioner's activities in this case.

Affirmed.