Argued and submitted January 11, affirmed April 18, 2012

In the Matter of the Compensation of
Gerald V. Miguez, Claimant.

## SAIF CORPORATION
and Huntons Sure Crop Farm Service,
*Petitioners,*

*v.*

Gerald V. MIGUEZ,
*Respondent.*

Workers' Compensation Board
1000774; A147585

277 P3d 601

Julie Masters argued the cause and filed the briefs for petitioners.

Christine Jensen argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

This workers' compensation case arises from the parties' disagreement over the rating of claimant's permanent partial disability (PPD), and it requires us to construe an administrative rule—OAR 436-035-0007(12) (2009)—that relates to the process by which such disability determinations are made.[1] Claimant's employer, Huntons Sure Crop Farm Service, and its insurer, SAIF Corporation, challenge an order in which the Workers' Compensation Board applied the administrative rule and, in doing so, "increased claimant's whole person impairment award for a right shoulder condition from 15 percent, as granted by an Order on Reconsideration, to 26 percent." Employer and SAIF contend that the board erroneously interpreted and applied the rule. This court reviews the board's order for substantial evidence and errors of law. ORS 656.298(7); ORS 183.482(8). On the basis of that review, we affirm.

As background, we briefly outline some of the statutes and rules that govern the PPD-determination process. The Workers' Compensation Law provides that, when an injured worker becomes "medically stationary and there is sufficient information to determine permanent disability," the employer's insurer "shall close the worker's claim * * * and determine the extent of the worker's permanent disability" except in limited circumstances not present here. ORS 656.268(1). In the course of closing the claim, the insurer makes findings about the extent of the worker's permanent disability under standards promulgated by the director of the Department of Consumer and Business Services (DCBS). ORS 656.268(5)(a). If the worker has lost the "use or function of a body part or system" due to a compensable injury or disease, the extent of the worker's impairment is "expressed as a percentage of the whole person," and impairment benefits are determined accordingly. ORS 656.214(1)(a). As an initial matter, the extent of that impairment "is established based

---

[1] SAIF issued the notice of closure on September 17, 2009. Accordingly, we apply the version of OAR 436-035-0007(12) that was in effect on that date. *See* OAR 436-035-0003(1). All references to the Oregon Administrative Rules in this opinion are to the version in effect on September 17, 2009.

on objective findings of the attending physician." OAR 436-035-0007(5). The insurer's notice of closure informs the worker of, among other things, "the amount of any further compensation, including permanent disability compensation to be awarded." ORS 656.268(5)(a).

Either the worker or the insurer may seek reconsideration by the director of DCBS and, if the objection to the notice of closure is "disagreement with the impairment used in rating of the worker's disability," the director will refer the claim to a medical arbiter or medical arbiter panel. ORS 656.268(8)(a); *see* ORS 656.268(8)(c) (regarding medical arbiter panels). The medical arbiter's findings are "submitted to the director for reconsideration of the notice of closure." ORS 656.268(8)(g). When a medical arbiter (or panel) has been used on reconsideration, "impairment is established based on objective findings of the medical arbiter, except where a preponderance of the medical evidence demonstrates that different findings by the attending physician are more accurate and should be used." OAR 436-035-0007(5). Those findings will be used to determine the extent of impairment—that is, the findings will be "rated"—*except* when "the physician [here, members of the arbiter panel] determines the findings are invalid and provides a written opinion, based on sound medical principles, explaining why the findings are invalid." OAR 436-035-0007(12).[2] The dispute in this case centers on

---

[2] The rule provides, in its entirety:

"Validity is established for findings of impairment according to the criteria noted in the *AMA Guides to the Evaluation of Permanent Impairment, 3rd Ed., Rev., 1990,* unless the validity criteria for a particular finding is not addressed in this reference, is not pertinent to these rules, or is determined by physician opinion to be medically inappropriate for a particular worker. Upon examination, findings of impairment which are determined to be ratable under these rules are rated *unless the physician determines the findings are invalid and provides a written opinion, based on sound medical principles, explaining why the findings are invalid.* When findings are determined invalid, the findings receive a value of zero. If the validity criteria are not met but the physician determines the findings are valid, the physician must provide a written rationale, based on sound medical principles, explaining why the findings are valid. For purposes of this rule, the straight leg raising validity test (SLR) is not the sole criterion used to invalidate lumber range of motion findings."

OAR 436-035-0007(12) (emphasis added). In this case, employer and SAIF have asserted that the *AMA Guides* "do not provide any particular validity criteria for rating the shoulder impairments." Claimant has not disputed that assertion. Accordingly, we do not address the first sentence of the rule in this opinion.

the meaning of that administrative rule, that is, what it means to "explain[ ]" why findings are invalid "based on sound medical principles."

The historical facts are undisputed. Claimant compensably injured his shoulder in January 2007, when he attempted to pick up a hydraulic pump while at work. SAIF accepted a condition described as a "right shoulder strain, glenoid labral tear, and long head of the biceps tear, right shoulder." Claimant had two surgeries for his injuries, but continued to experience severe pain and did not appear to improve with continuing therapy. In January 2009, after determining that claimant's condition was not likely to improve with further treatment, claimant's attending physician recommended that claimant have an independent medical evaluation (IME) to assist in claim closure.

That IME was performed by Dr. Todd Lewis, in conjunction with a work capacity evaluation (WCE) by Susan Bottomley, on April 22, 2009. During both examinations, claimant reported that he avoided using his right arm for any functional activities because of pain. He specifically told Bottomley that he did not steer his car with his right hand. After claimant left their office, however, both physicians saw him walk with a symmetric arm swing, get into his car, "place the right arm on the top of the steering wheel," and pull out of a parking spot "steering throughout the parking lot to exit while continuing to hold [a] cell phone to his left ear with [his] left arm and steering the truck solely with his right arm." Based on their observations of claimant's behavior during and as he left the evaluations, Lewis and Bottomley concluded that the range-of-motion findings that they had made during their examinations were invalid. Bottomley expressly opined in her report, "If there is any valid limitation it is obscured by the degree of dysfunction presented. Based upon this, valid restrictions can not be determined."

Claimant's attending physician conducted a closing examination on May 26, 2009, and proclaimed claimant to be medically stationary as of that date. He reported that he did not fully concur with Lewis's and Bottomley's determinations and, upon further inquiry from SAIF, he opined that

Bottomley's reported range-of-motion findings *were* valid for purposes of rating claimant's right shoulder impairment.

After the closing examination but before SAIF closed the claim, both Lewis and claimant's attending physician were shown a brief videotape of claimant walking to his car after the April 22 examinations, taken from a surveillance camera located outside Lewis's and Bottomley's office. Lewis asserted that the videotape supported his reported observations that claimant acted contrary to his described and demonstrated disability. The attending physician disagreed, opining that the videotape footage was "very brief and inconclusive."

In September 2009, Dr. Lynne Bell conducted an insurer-requested review of claimant's medical history and examination of claimant. Bell reported that she was "unable to determine the extent to which [claimant's] demonstrated range of motion of the right shoulder is an accurate reflection of his true abilities." She also stated that claimant "exhibited inconsistencies and non-physiological findings on today's hand dynamometer testing and similar inconsistencies were found during the more extensive physical capacities evaluation performed by Susan Bottomley."

Surveillance of claimant was also conducted by a SAIF investigator over the course of seven days between early June and early August, 2009. That surveillance resulted in two short videos of claimant walking with a symmetrical arm swing and using his right hand to unlock his vehicle. All of the physicians who had examined claimant were asked to comment on those videos. Lewis and Bottomley opined that the footage supported their observations during the April 22, 2009, examinations. Bell, however, opined that the "video footage available to [her] did not depict [claimant] putting his shoulder through greater range of motion than that documented at the time of [her] own examination," and claimant's attending physician opined that the video did not change his opinion that Bottomley's range-of-motion findings should be rated.

SAIF closed the claim on September 17, 2009. SAIF rated Bottomley's range-of-motion findings and awarded a total of 25 percent whole person impairment, accounting for

work disability. SAIF immediately requested reconsideration before the Appellate Review Unit (ARU) of DCBS's Workers' Compensation Division, with examination by a medical arbiter panel.

A panel of three medical arbiters examined claimant on January 22, 2010. Based on that examination and its review of the record, the arbiter panel reported findings that showed reduced range of motion in claimant's right shoulder. Specifically, the arbiters found that claimant "*is* significantly limited in the repetitive use of the right shoulder due to the accepted conditions and subsequent treatment," and that "any valid findings of impairment are related to the accepted conditions." (Emphasis in original.) The arbiter panel determined, however, that those findings were invalid for purposes of rating impairment, stating:

> "It is our impression that the ranges of motion seen on today's exam are not valid for the purpose of measuring permanent impairment. [Claimant] demonstrated significantly improved motion at prior exams and during surveillance video. There were some pain behaviors during the exam that suggest his motion may have been self-limited due to symptoms and fear of re-injury. For these reasons, it is our opinion that the ranges of motion seen today are not valid for the purpose of measuring permanent impairment[.]"

In its order on reconsideration, the ARU stated that the arbiter panel's report was "based on sound medical principles and the most objective findings" and that it was "expressed in clear and concise reasoning and provides an accurate history." The ARU then adopted the arbiter panel's determination that its range-of-motion findings were invalid and, accordingly, the ARU reduced claimant's total PPD award from 25 percent to 15 percent, deleting the amount that originally had been awarded for lost range of motion. *See* OAR 436-035-0007(12) (requiring that, when findings are determined invalid, the findings receive a value of zero).

Claimant requested a hearing, arguing that the ARU erred in not rating the arbiter panel's range-of-motion findings.[3] Claimant relied on OAR 436-035-0007(12). As

---

[3] In lieu of proceeding to a hearing, the parties submitted the matter to the ALJ for a decision based on the exhibits and their written arguments.

noted, the pertinent portion of that rule requires that ratable impairment findings be rated, upon examination

> "unless the physician determines the findings are invalid and provides a written opinion, based on sound medical principles, explaining why the findings are invalid."

Claimant contended that the arbiter panel's written opinion did not adequately explain why the arbiter panel's findings were invalid, and he asserted that the arbiter panel's range-of-motion findings should have been rated. The ALJ agreed and amended the ARU's order on reconsideration to award claimant a total PPD award of 26 percent. The board adopted the ALJ's order and affirmed.

SAIF seeks judicial review of the board's order. As an initial matter, we consider—and reject—SAIF's argument that the ARU implicitly interpreted OAR 436-035-0007(12) in its order on reconsideration and that the board erred in not deferring to that plausible interpretation. Under *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994), we defer to an agency's interpretation of its own administrative rule if that interpretation is plausible. In previous workers' compensation cases, we have deferred to the ARU's plausible interpretations of DCBS rules, reasoning that the ARU was the department's delegate for that purpose. *Liberty Northwest Ins. Corp. v. Norton*, 213 Or App 530, 535, 162 P3d 322 (2007); *SAIF v. Donahue-Birran*, 195 Or App 173, 181-82, 96 P3d 1282 (2004). Consequently, if the ARU had interpreted OAR 436-035-0007(12) in the course of resolving SAIF's reconsideration request, we would defer to that interpretation if it was plausible.

The ARU's order on reconsideration does not, however, include any rule interpretation that we can assess for plausibility. In adopting the arbiter panel's opinion that its range-of-motion findings were invalid, the ARU simply applied OAR 436-035-0007(12) to the pertinent facts; it did not *interpret* what that provision means when, for example, it requires a written opinion "explaining" why the impairment findings are invalid. Consequently, there is no rule interpretation to which we could defer. *See ETU, Inc. v. Environmental Quality Commission*, 343 Or 57, 68, 162 P3d 248 (2007) (an agency's "ad hoc determination" that the

respondents' asserted "cause" for a late request for hearing "was not * * * beyond respondents' reasonable control" was "merely an *application* of the agency's rule to a given set of facts," not a rule interpretation (emphasis in original)). *Compare Gienger v. Dept. of State Lands*, 230 Or App 178, 186-87, 214 P3d 75 (2009), *rev den*, 348 Or 13 (2010) (agency interpreted rule in the course of applying it by recounting, in the order, two of its own regulatory definitions and discussing how they applied, in concert, to the facts of the case). We acknowledge that there are cases in which an agency order necessarily is premised on an implicit interpretation of its own rule. *See, e.g., Donahue-Birran*, 195 Or App at 180-82 (in applying an ambiguous rule that had "two possible meanings," the ARU necessarily interpreted the rule as having one of those two meanings, and not the other). This, however, is not such a case.

Questions of deference aside, we are left to address SAIF's argument that the board misapplied OAR 436-035-0007(12). As quoted above, the arbiter panel opined that its range-of-motion findings were invalid because claimant "demonstrated significantly improved motion at prior exams and during surveillance video" and his pain behaviors suggested that his motion was "self-limited." In rejecting the panel's invalidity determination, the ALJ—and by adoption, the board—concluded that those comments lacked sufficient explanation, in part because the panel's opinion (1) did not identify the specific prior examinations during which claimant allegedly exhibited "significantly improved motion"; (2) did not explain how claimant's movements in the video contradicted the panel's findings upon examination; and (3) failed to identify claimant's alleged pain behavior or describe specific observations made during the examination that suggested claimant was intentionally limiting his movement.

Given the board's disposition, the first question we address is what, as a matter of law, must be included in a medical report to satisfy OAR 436-035-0007(12)'s requirement that the examining physician (here, the medical arbiter panel) provide a "written opinion, based on sound medical principles, explaining why the findings are invalid." In

SAIF's view, that provision is satisfied if a physician's conclusion that findings are invalid "is offered with reasons" that are "based on doctrines or assumptions that are accurate and supported by knowledge or experience." As we read it, SAIF's argument turns on the premise that the medical report is sufficient as long as it cites a medical principle or observation that forms the basis for the physician's determination of invalidity, even if that determination is presented in the form of a bare conclusion.

SAIF's interpretation of the rule overlooks the significance of the requirement in OAR 436-035-0007(12) that an arbiter provide an opinion not only "based on sound medical principles" but also *explaining* why the findings are invalid." (Emphasis added.) As relevant here, to "explain" can mean: "to make plain or understandable"; to "give the meaning or significance of"; to "provide an understanding of"; or "to show the logical development of." *Webster's Third New Int'l Dictionary* 801 (unabridged ed 2002). Thus, in using the word "explaining," OAR 436-035-0007(12) contemplates that—in addition to being based on sound medical principles—a written opinion also must "show the logical development of" any conclusion that findings are invalid, in a way that makes the conclusion "plain or understandable." Such an explanation need not be detailed but must, at a minimum, indicate not only *what* observations or other information led the examining physician to believe that his or her impairment findings were invalid, but also *how* those observations or information contradicted the findings, and *why* the contradictions are medically significant.

With that understanding in mind, we conclude that the board's application of OAR 436-035-0007(12) was not legally erroneous and that its interpretation of the arbiter panel's report was supported by substantial evidence. *See O'Connor v. Liberty Northwest Ins. Corp.*, 232 Or App 419, 425, 222 P3d 1097 (2009) (explaining standards of review). In applying OAR 436-035-0007(12), the board reasoned that the arbiter panel's written opinion was insufficient because it did not specifically identify which prior examination or examinations the arbiters had relied upon, did not explain how the arbiters' measured ranges of motion conflicted with those

observed either in prior evaluations or on videotape, and failed to discuss the ways in which the arbiters both thought that claimant intentionally had limited his movement. That understanding of OAR 436-035-0007(12) is consistent with our conclusion that the rule required the arbiters both to identify the medical observations or information on which their invalidity determination was based and to discuss the reasoning—*i.e.*, the logical analysis—that led them to conclude that those observations conflicted with their own range-of-motion measurements (or otherwise called those measurements into question) in a medically significant way.

We also conclude that the record supports the board's conclusion that, as a factual matter, the arbiter panel's opinion was too conclusory to constitute an explanation of why its impairment findings were invalid. In completing its examination process, the arbiter panel reviewed the entire medical record, as well as surveillance videotapes obtained before claim closure. During the processing of the claim, claimant had an IME, a work-capacity evaluation, and an insurer-requested medical evaluation. Each evaluating physician prepared a report with range-of-motion findings and observations made during and after examination. Each of those physicians, as well as claimant's attending physician, also viewed three short surveillance videos—depicting claimant walking with a symmetrical arm swing and using his right hand to unlock his vehicle—and commented on whether what they observed in the videos was consistent or inconsistent with their range-of-motion findings. Significantly, some of the physicians contended that the surveillance video rendered impairment findings invalid, but some did not. Given that record, the board reasonably could find that the arbiter panel's reference to "prior exams" and "surveillance video" did not adequately identify which medical observations contradicted the arbiter panel's impairment findings, or in what medically significant way the observations and findings conflicted.

In short, we conclude that the board's order was supported by substantial evidence and that the board applied OAR 436-035-0007(12) correctly. We have considered the

remaining arguments made by SAIF and employer, and we reject them without discussion.

Affirmed.